UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X



UNION GLORY LTD.,

                    Plaintiff,

    - against -

LOVELL SEA CARRIERS INC.,

                    Defendant.

--------------------------------------------------------------X

Case No.:

**VERIFIED COMPLAINT**

Plaintiff UNION GLORY LTD. ("Plaintiff"), by and through its attorneys, Clyde & Co US LLP, as and for its Verified Complaint against the Defendant LOVELL SEA CARRIERS INC. ("Defendant"), alleges upon information and belief as follows:

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333.

2.    At all times material hereto, Plaintiff was and is a foreign business entity duly organized and existing under the laws of the United Kingdom.

3.    Upon information and belief, at all times material hereto, Defendant was and is a foreign business entity duly organized and existing under the laws of Republic of the Marshall Islands.

4.    On or about February 5, 2009, Plaintiff, as Charterer, and Defendant, as Owner, entered into a Time Charter Party pursuant to which Defendant chartered to Plaintiff the M/T "LOVELL SEA" (the "Vessel") for a period of 4 months +/- 10 days in Charterer's option from the time and date of the delivery of the Vessel. A copy of the Charter Party is attached hereto as Exhibit "A."

5.    Following redelivery of the Vessel to Defendant, a Final Statement of Accounts was presented to the Defendant which set forth that $109,580.66 was due and owing by Defendant to Plaintiff under the terms of the Charter Party.  A copy of the Final Statement of Accounts is annexed hereto as Exhibit "B."

6.    On September 15, 2009, a final demand for payment was sent by Plaintiff to Defendant.  A copy of the final demand for payment is annexed hereto as Exhibit "C."

7.    Defendant has breached the Charter Party by failing to pay the outstanding debt of $109,580.66 despite due demand.

8.    Plaintiff has complied with all terms and obligations of the Charter Party.

9.    As a result of Defendant's breach of the Charter Party, Plaintiff has sustained damages in the total principal amount of at least $109,580.66, exclusive of interest, costs and attorneys fees.

10.    The Charter Party provides that disputes arising thereunder are to be referred to London Arbitration with English law to apply.

11.    Plaintiff commenced the arbitration in London on September 22, 2009.

12.    Interest, costs and attorneys' fees routinely are awarded to the prevailing party in London Arbitration pursuant to English Law. As best as can now be estimated, Plaintiff expects to recover the following amounts:

| | | | |
|---|---|---|---|
| A. | Principal claim | $ | 109,580.66; |
| B. | Estimated interest on claim-<br>3 years at 7.5% compounded quarterly: | $ | 27,364.09; |
| C. | Estimated attorneys' fees and expenses: | $ | 50,000.00; |
| | Total: | $ | 186,944.75 |

13.    Upon information and belief, Defendant is and during the pendency of this litigation will continue to be engaged in international maritime commerce.

14.    International business transactions such as those engaged in by Defendant in the regular course of its business operations frequently require payments to be made in U.S. Dollars. *See e.g.*, Charter Party, Exhibit "A" hereto, Clause 9 requiring payment of hire in U.S. Dollars.

15.    Upon information and belief, because Defendant is and will continue to be during the pendency of this litigation engaged in international commerce, it will continue to enter into business transactions requiring that the payments be made in U.S. Dollars.

16.    Upon information and belief, U.S. Dollar payments made pursuant to international commercial transactions of the type engaged in by Defendant frequently are made via electronic fund transfers. Approximately 95% of all electronic funds transfers between non-U.S. parties transacting business in U.S. Dollars are made via the Clearing House Interbank Payments System ("CHIPS"). These payments involve routing the electronic funds transfers through a CHIPS participating bank, usually located in New York City, operating as an intermediary bank, in order to convert the foreign currency into U.S. Dollars.

17.    Upon information and belief, because Defendant is and will continue to be during the pendency of this litigation engaged in international commerce, it will continue to make or receive some or all of the payments involved in that commerce in U.S. Dollars, and some or all of those payments will be made via electronic funds transfers processed through the CHIPS system, and will be routed through a CHIPS participating bank located in New York City (within this District) in order to convert the foreign currency into U.S. Dollars.

18.    Under the law of the Second Circuit, electronic funds transfers to or from a party in the hands of an intermediary bank are considered to be the property of that party and can be

attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"). *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 436 (2d Cir. 2006).

19.    Accordingly, upon information and belief, Defendant has or will have during the pendency of this litigation assets in this District in the form of electronic funds transfers at banks located in this District.

20.    The Defendant cannot be found within this District within the meaning of Rule B but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

21.    The Plaintiff seeks an order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching any assets of the Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiff's claims as described above.

WHEREFORE, Plaintiff prays as follows:

A.    That process in due form of law issue against Defendant, citing Defendant to appear and answer under oath all and singular the matters alleged in the Verified Complaint failing which default judgment be entered against it in the sum of $186,944.75;

B.    That since the Defendant cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all goods, chattels, credits, letters of credit, bills of lading, effects, electronic fund transfers, debts and monies, tangible or intangible, or any funds up to the amount of $186,944.75 belonging to, due or being transferred to, from, or

for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit, at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

      C.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

      D.     That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

      E.     That in the alternative, this Court enter Judgment against the Defendant on the claims set forth herein;

      F.     That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

      G.     That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated: October 2, 2009
     New York, New York

                           CLYDE & CO US LLP

                           By:
                           Christopher Carlsen (CC 9628)
                           405 Lexington Avenue
                           New York, New York 10174
                           Tel: (212) 710-3900
                           Fax: (212) 710-3950
                           Christopher.carlsen@clydeco.us
                           Attorneys for Plaintiff

**VERIFICATION**

STATE OF NEW YORK    )
                          ) ss.:
COUNTY OF NEW YORK  )

1.      My name is Christopher Carlsen.

2.      I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.      I am a member in the firm of Clyde & Co US LLP, attorneys for the Plaintiff.

4.      I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.      The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.      The source of my knowledge and the grounds for my beliefs are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.      I am authorized to make this Verification on behalf of the Plaintiff.

Dated:      October 2, 2009
             New York, New York

                                        Christopher Carlsen

Sworn to before me this 2nd day of October, 2009

Notary Public

DANIEL CORRELL
Notary Public, State of New York
No. 02CO6102892
Qualified in Nassau County
Commission Expires Dec. 8, 2011

EXHIBIT A

*09/018*

Code word for this Charter Party
"SHELLTIME 4"

**ORIGINAL**

*Issued December 1984*

Time Charter Party

Hellevoetsluis, ~~LONDON~~.    5ᵗʰ. February 2009

|  | | |
|---|---|---|
| | IT IS THIS DAY AGREED between *LOVELL SEA CARRIERS INC.* | 1 |
| | of *Majuro / Marshall Islands*                ( hereinafter referred to as "Owners" ), being Owners of the | 2 |
| | good                                vessel called *M/T "LOVELL SEA"* | 3 |
| | ( hereinafter referred to as "the vessel") described as per Clause 1 hereof and *Union Glory Ltd, London, Portland* | 4 |
| | *House, 69-71 Wembley Hill Road* | |
| | of *WEMBLEY HA9 8BU Middlesex / United Kingdom*                ( hereinafter referred to as "Charterers") : | 5 |

Description and
Condition of
Vessel

1.    At the date of delivery of the vessel under this charter
(a)    she shall be classed: *Bureau Veritas*
(b)    she shall be in every way fit to carry ~~crude petroleum and/or its products~~ ½ grade(s) CPP within vessel's natural segregation unleaded *untanker than 2.5 NPA, Intention Gasoil, UMS, Kerosine, Jetfuel, in accordance with vessel's certificate of fitness / cooling resistance list.*
(c)    she shall be tight, staunch, strong, in good order and condition, and in every way fit for the ordinary service, with her machinery, boilers, hull and other equipment ( including but not limited to hull stress calculator and radar ) in good and efficient state;
(d)    her tanks, valves and pipelines shall be oil-tight;
(e)    she shall be in every way fitted for burning
at sea– fueloil with a maximum viscosity of grade agreed mutually by Owners and Charterers  any commercial ~~grade of fueloil ("AGGFO")~~ for main propulsion, marine-diesel-oil/AGGFO grade agreed mutually by Owners and Charterers  for auxiliaries
in port  and at sea and during inerting– marine-diesel-oil/AGGFO grade agreed mutually by Owners and Charterers for auxiliaries. *See rider clause for bunker quality.*

6
7
8

9
10
11
12
13
14
15
16
17

(f)    she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals by day and night without delay;
(g)    she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay:
(h)    she shall comply with the description in Form-B Questionnaire 88 appended hereto, provided however that if there
is any conflict between the provisions of ~~Form-B Questionnaire 88~~ and any other provision, including this Clause 1, of this charter such other provision shall govern.

18
19
20
21
22
23
24

Shipboard
Personnel
and their duties

2.    (a)    At the date of delivery of the vessel under this charter
(i)    she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be trained to operate the vessel and her equipment competently and safely;
(ii)    all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the law of the flag state;
(iii)    all shipboard personnel shall be trained in accordance with the relevant provisions of the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers 1978;
(iv)    there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be carried out quickly and efficiently.
(b)    Owners guarantee that throughout the charter service  the master shall with the vessel's officers and crew, unless otherwise ordered by Charterers,
(i)    prosecute all voyages with the utmost despatch;
(ii)    render all customary assistance; and
(iii)    load and discharge cargo as rapidly as possible when required by Charterers or their agents to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state.

25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43

Duty to
Maintain

3.    (i)    Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any event ( whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2 (a), exercise due diligence so to maintain or restore the vessel.
(ii)    If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clauses 1, 2 (a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire of the time so lost. *Charterers can claim for off hire time.*

Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Clause 24.
(iii)    If Owners are in breach of their obligation under Clause 3 (i) Charterers may so notify Owners in

44
45
46
47
48
49
50
51
52
53
54
55

writing: and if after the expiry of 30 days following the receipt by Owners of any such notice, ~~Owners have failed~~ 56
~~to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3 (i), the~~ 57
~~vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they~~ 58
~~are exercising such due diligence.~~ 59
Furthermore, ~~at any time while~~ *if the vessel is off-hire for more than 30 consecutive days, except* 60
*for calling at drydock or repair yard*, under this Clause 3 Charterers have the
option to terminate this charter by giving notice in writing with effect from the date on which such notice of 61
termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without 62
prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without 63
limitation Charterers' rights under Clause 21 hereof ) 64

| | | |
|---|---|---|
| | 4. Owners agree to let and Charterers agree to hire the vessel for a period of *4 months +/- upto 10 days in Charterers' option* | 65 |
| Period Trading | | |
| Limits | commencing from the time and date of delivery of the vessel, *for the purpose of carrying at lawful merchandise - ½ grade(s) CPP within vessel's natural segregation unleaded unlarker than 2.5 NPA* | 66 |
| | ~~subject always to Clause 28)~~ *including in particular West Africa Dakar -- Luanda range. Excluding UN banned countries and Warlike zones and excluding River Rhobi terms / Ocrica Terminal. Intended trade : load / discharge ship-to-ship off-shore Lagos and Nigerian ports,* | 67 |

~~in any part of the world, as Charterers shall direct, subject to the limits of the current British Institute Warranties~~ 68
~~and any subsequent amendments thereof. Notwithstanding the foregoing but subject to Clause 25, Charterers~~ 69
~~may order the vessel to ice-bound waters or to any part of the world outside such limits (such consent not Owners~~ 70
~~consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance~~ 71
~~premium required by the vessel's underwriters as a consequence of such order.~~ 72
Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places 73
( which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine 74
lines, alongside vessels or lighters and other locations including locations at sea ) where she can safely *enter lie* 75
*and depart* always
afloat.   ~~Notwithstanding anything contained in this or any other clause of this charter. Charterers do not warrant~~ 76
~~the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for~~ 77
~~direct loss or damage caused by their failure to exercise due diligence as aforesaid.~~ Subject as above, the vessel shall be 78
loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due 79
diligence to ensure *warrant* that any ship-to-ship transfer operations shall conform to standards not less than those 80
set out
in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide . *See rider Clause ship-to-ship transfer.* 81
The vessel shall be delivered by Owners at a port ~~in~~ *- off Cotonou free of cargo and slops* 82

at Owners' option and redelivered to Owners at a port ~~in~~ *off Cotonou free of cargo and slops* 83

at Charterers' option.. 84

| | | |
|---|---|---|
| Laydays/ | 5. The vessel shall not be delivered to Charterers before *06th. February 2009 -- 00:01 hours* and Charterers shall | 85 |
| Cancelling | have the option of cancelling this charter if the vessel is not ready and at their disposal on or before *06th. February 2009 -- 23:59 hours* | 86 |

| | | |
|---|---|---|
| Owners to | 6. Owners undertake to provide and to pay for all provisions, wages and shipping and discharge fees | 87 |
| Provide | and all other expenses of the master, officers and crew; also except as provided in Clauses 4 and 34 hereof, for all | 88 |
| | insurance on the vessel, for all deck, cabin and engine-room stores and for water *and lubricating oil*, for all | 89 |

drydocking, overhaul,
maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners' 90
obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the 91
performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to 92
the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall 93
refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of 94
any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited 95
to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire. 96

| | | |
|---|---|---|
| Charterers to | 7. Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and | 97 |
| Provide | pilotage and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal | 98 |
| | dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all | 99 |

charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for 100
Owners' purposes or while the vessel is off-hire ( unless such items reasonably relate to any service given or 101
distance made good and taken into account under Clause 21 or 22 ); and provided further that any fuel used in 102
connection with a general average sacrifice or expenditure shall be paid for by Owners. 103

| | | |
|---|---|---|
| Rate of | 8. Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of | 104 |
| Hire | *USD. 12,500,--* per day, and pro rata for any part of a day, from the time and date of her delivery (local | 105 |
| | time) until the time and date of her redelivery (local time) to Owners. | 106 |

| | | |
|---|---|---|
| Payment of | 9. Subject to Clause 3 (iii), payment of hire, *payable every 30 days in advance in United States dollars by t.t.* | 107 |
| Hire | shall be made in immediately available funds *to a nominated bank account* : | |

| | | |
|---|---|---|
| | Account tba | 108 |
| In | ~~per calendar month in advance, less:~~ | 109 |
| | (i) ~~any hire paid which Charterers reasonably estimate to relate to off-hire periods and~~ | 110 |
| | (ii) ~~any amounts disbursed on Owners' behalf, any advances and commission thereon and~~ | 111 |
| | ~~charges which are for Owners' account pursuant to any provision hereof, and~~ | 112 |

      (iii)    any amounts due or reasonably estimated to become due to Charterers under Clause 5 (ii) or    113
24 hereof,    114
any such adjustments to be made at the due date for the next monthly payment after the facts have been    115
ascertained *justified and agreed between Owners and Charterers*.  Charterers shall not be responsible for any    116
delay or error by Owners' bank in crediting Owners'
account provided that Charterers have made proper and timely payment.    117
    In default of such proper and timely payment, *or for any other amounts due to Owners under this Charter*    118
*Party*

    (a)    Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of    119
such notice pay to Owners the amount due including interest, failing which Owners may withdraw, withhold or    120
suspend the vessel from
the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise.    121
*Owners shall not be liable for any delay, loss or additional expenses incurred to Charterers due to this withholding,*
*withdrawing or suspending the service*
and    122

    (b)    Interest on any amount due but not paid on the due date shall accrue from the day after that date    123
up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime    124
Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date    125
or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which    126
such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded    127
semi-annually.    128

**Space Available to Charterers**    10.    The whole reach, burthen and decks of the vessel and any passenger accommodation (including    129
Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master,    130
officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall    131
not, unless specially agreed, exceed *300 metric*    tonnes at any time during the charter period.    132

**Overtime**    11.    Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers'    133
account when incurred, as a result of complying with the request of Charterers or their agents, for loading,    134
discharging, heating of cargo, bunkering or tank cleaning.    135

**Instructions and Logs**    12.    Charterers shall from time to time give the master all requisite instructions and sailing directions and    136
he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as    137
required. The master shall when required furnish Charterers or their agents with a true copy *abstracts* of such log    138
and with
properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as    139
Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such document    140
which are not provided by the master.    141

**Bills of Lading**    13.    (a)    The master (although appointed by Owners) shall be under the orders and direction of    142
Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading *in*    143
*strict conformity with mate receipts* as
Charterers or their agents may direct (subject always to Clause 35 (a) and 40) without prejudice to this charter.    144
Charterers hereby indemnify Owners against all consequences or liabilities that may arise    145
    (i)    from signing bills of lading in accordance with the directions of Charterers or their agents to    146
the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as    147
provided in Clause 13 (b)) from the master otherwise complying with Charterers' or their agents' orders:    148
    (ii)    from any irregularities in papers supplied by Charterers or their agents    149
    (b)    Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from    150
Charterers to discharge all or part of the cargo    151
    (i)    at any place other than that shown on the bill of lading and/or    152
    (ii)    without presentation of an original bill of lading    153
    unless they have received from Charterers both written confirmation of such orders and an    154
indemnity in a form acceptable to Owners.    155

**Conduct of Vessel's Personnel**    14.    If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall    156
immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay,    157
make a change in the appointments and Owners shall in any event communicate the result of their investigations    158
to Charterers as soon as possible.    159

**Bunkers at Delivery and Redelivery**    15.    Charterers shall accept and pay for all bunkers on board at the time of delivery and Owners shall on    160
redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept    161
and pay for all bunkers remaining on board, at the then current market prices at the port of delivery or redelivery    162
as the case may be, or if such prices are not available payment shall be at the then current market prices at the    163
nearest port at which such prices are available, provided that if delivery or redelivery does not take place in a port    164
payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the case    165
may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to    166
time, if so required by Charterers, provided suppliers agree. *Charterers are allowed to supply bunkers to the vessel prior*    167
*to delivery, See furthermore rider clause for bunker quality.*

**Stevedores, Pilots, Tugs**    16.    Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners    168
from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict    169
account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents    170
against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of    171
pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in    172
the service of Owners and under their instructions (even if such pilots, tugboats personnel or stevedores are in fact    173
the servants of Charterers, their agents or any affiliated company); provided, however that    174
    (i)    the foregoing indemnity shall not exceed the amount to which Owners would have been    175
entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and    176

ORIGINAL

(ii)   Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefore from stevedores.

**Supernumeraries**   17.   Charterers may send representatives in the vessel's available accommodation upon any voyage made under this charter. Owners finding provisions and all requisites as supplied to officers, except liquors, Charterers paying at the rate of *USD, 15,00*   per day for each representative while on board the vessel *which representative will sign the usual LOI provided by Master.*

**Sub-letting**   18.   Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter.

**Final Voyage**   19.   If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected, *and agreed in prior between Charterers and Owners* to become due for

(i)   disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and

(ii)   bunkers on board at redelivery pursuant to Clause 15.

Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers.

If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be.

**Loss of**   20.   Should the vessel be lost, this charter shall terminate and hire shall cease at noon *the time* on the day of her loss:

**Vessel**   should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon *the time* on the day on which the vessel's underwriters agree that the vessel is a constructive total loss: should the vessel be missing, this charter shall terminate and hire shall cease at noon *the time* on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port.

**Off-hire**   21.   (a)   On each and every occasion that there is *in the event of* loss of time ( whether by way of interruption in the vessel's service or from reduction in the vessel's performance, or in any other manner )

(i)   due to deficiency of *Owners'* personnel or stores; repairs; gas-freeing of repairs; time in and waiting to enter dry dock for repairs, breakdown ( whether partial or total ) of machinery, boilers or other parts of the vessel or her equipment ( including without limitation tank coatings ); overhaul, maintenance or survey; collision, stranding, grounding or accident to the vessel; or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than three consecutive hours ( if resulting from interruption in the vessel's service ) or cumulates to more than three hours ( if resulting from partial loss of service ); or

(ii)   due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or

(iii)   for the purpose of obtaining medical advice or treatment for or landing any sick or injured person ( other than a Charterers' representative carried under Clause 17 hereof ) or for the purpose of landing the body of any person ( other than a Charterers' representative ), and such loss continues for more than three consecutive hours; or

(iv)   due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers or crew; or

(v)   due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or owners ( unless brought about by the act or neglect *or default* of Charterers ); then

without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

(b)   If the vessel fails to proceed at an guaranteed *C/P speed. The specific Calorific Value, of MDO* grade that will be used will be lower than IFO, hence c/p speed cannot be guaranteed, pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21 (a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between

(i)   the time the vessel would have required to perform the relevant service at such guaranteed *C/P speed. The specific Calorific Value, of MDO   a grade that will be used will be lower than IFO, hence c/p speed cannot be guaranteed* and

(ii)   the time actually taken to perform such service ( including any loss of time arising from interruption in the performance of such service ).

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.

(c)   Further and without prejudice to the foregoing, in the event of the vessel deviating ( which expression includes without limitation putting back, or putting into any port other than that to which she is bound

ORIGINAL

under the instructions of Charterers) for any cause or purpose mentioned in Clause 21 (a), the vessel shall be 242
off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state 243
to resume her service from a position not less favourable to Charterers than that at which the deviation 244
commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire 245
shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or 246
purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the 247
instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. 248
Should the vessel be driven into any port or anchorages by stress of weather hire shall continue to be due and 249
payable during any time lost thereby. 250

(d)    If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such 251
hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof 252
then from the date of receipt by Owners of such notice until the termination of such commercial impracticability 253
the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account. 254

(e)    Time during which the vessel is off-hire under this charter shall count as part of the charter 255
period., *provided Charterers declare such option within 10 days, counting from the last date of agreed off-hire period.* 256

22.    (a)    ~~Owners have the right and obligation to drydock the vessel at regular intervals of~~ 257
~~On each occasion Owners shall prepare to Charterers a date on which they wish to~~ 258
~~drydock the vessel, not less than                      before such date and Charterers shall offer a port for~~ 259
~~such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as~~ 260
~~practicable.~~ 261

~~Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers~~ 262
~~place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be~~ 263
~~responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have~~ 264
~~the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any bill of~~ 265
~~lading or this charter.~~ 266

~~(b)    If a periodical drydocking is carried out in the port offered by Charterers (which must have~~ 267
~~suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall~~ 268
~~be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to~~ 269
~~resume Charterers' service and is at the position at which she went off-hire or a position no less favourable to~~ 270
~~Charterers, whichever she first attains. However,~~ 271

~~(i)    provided that Owners exercise due diligence in gas-freeing any time lost in gas-freeing to~~ 272
~~the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether~~ 273
~~lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21 ), and~~ 274

~~(ii)    any additional time lost in further gas-freeing to meet the standard required for hot work or~~ 275
~~entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there.~~ 276
~~Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any~~ 277
~~calculation under Clause 24.~~ 278

~~The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for~~ 279
~~Owners' account.~~ 280

~~(c)    If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical~~ 281
~~drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to~~ 282
~~proceed to the special port until she next presents for loading in accordance with Charterers' instructions;~~ 283
~~provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at~~ 284
~~the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but~~ 285
~~Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage~~ 286
~~calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any~~ 287
~~benefit they may gain in purchasing bunkers at the special port.~~ 288

~~(d)    Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of~~ 289
~~tank cleaning necessary to meet Charterers' requirement, credit Owners with the value of any bunkers which~~ 290
~~Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or special port.~~ 291
*Deleted as not applicable.*

~~Ship Inspection~~
23.    Charterers shall have the right at any time *at their expense against signing usual lci provided by Master* 292
during the charter period to make such inspection of the
vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in 293
their absolute discretion may determine and whether the vessel is in port or on passage *and provided Owners* 294
*agree to such inspection which not to be unreasonably withheld*. Owners affording all
necessary co-operation and available accommodation on board provided, however, 295

(i)    that neither the exercise nor the non-exercise, nor anything done or not done in the exercise 296
or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or 297
responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase 298
Charterers' responsibilities to owners or third parties for the same; and 299

~~(ii)    that Charterers shall not be liable for any act, neglect or default by themselves, their~~ 300
~~servants or agents in the exercise or non-exercise of the aforesaid right.~~ 301

Detailed
Description
and Performance    24.    (a)    ~~Owners guarantee that the speed and consumption of the vessel shall be as follows:~~ 302

~~Average speed                                    Maximum average bunker consumption~~ 303
~~in knots about :                                  main propulsion           auxiliaries~~ 304
305

*See rider Clause description and speed and consumption* 306

307

The foregoing bunker consumption are for all purposes except cargo heating, tank cleaning 308
and shall be pro-rated between the speeds shown. 309

ORIGINAL

The service speed of the vessel is 12     knots laden and 12     knots in ballast and in the absence    310
of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one    311
laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to    312
steam at any speed within the range set out in the table (the "ordered speed").    313
 If the vessel is ordered to proceed at any speed other than the highest speed shown in the table,    314
and the average speed actually attained by the vessel during the currency of such order exceeds such ordered    315
speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating any increase or    316
decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed    317
actually attained.    318
 For the purpose of this charter the "guaranteed speed" at any time shall be the then-current    319
ordered speed or the service speed, as the case may be    320
 The average speeds and bunker consumptions shall for the purposes of this Clause 24 be    321
calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each    322
period stipulated in Clause 24 (a), but excluding any time during which the vessel is (or but for Clause 22 (b) (i)    323
would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction    324
of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds    325
exceed force 8 on the Beaufort Scale for more than 12 hours.    326

 (b) If during any year from the date on which the vessel enters service (anniversary to anniversary)    327
the vessel falls below or exceeds the performance guaranteed in Clause 24 (a) then if such shortfall or excess    328
results    329
 (i) from a reduction or an increase in the average speed of the vessel, compared to the speed    330
guaranteed in Clause 24 (a), then an amount equal to the value at the hire rate of the time so lost or gained, as the    331
case may be, shall be deducted from or added to the hire paid;    332
 (ii) from an increase or a decrease in the total bunkers consumed, compared to the total bunkers    333
which would have been consumed had the vessel performed as guaranteed in Clause 24 (a), an amount equivalent    334
to the value of the additional bunkers consumed or the bunkers saved, as the case may be based on the average    335
price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid    336
 The addition to or deduction from hire so calculated for laden and ballast mileage respectively    337
shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather    338
Periods, by dividing such addition or deduction by the number of miles over which the performance has been    339
calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather    340
Periods, in order to establish the total addition to or deduction from hire to be made for such period.    341
 Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other    342
remedy available to Charterers.    343
 (c) Calculations under this Clause 24 shall be made for the yearly periods terminating on each    344
successive anniversary of the date on which the vessel enters service, and for the period between the last such    345
anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire    346
arising under this Clause during the final year or part year of the charter period shall in first instance be settled    347
in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary    348
adjustment after this charter terminates shall be made payment by Owners to Charterers or by Charterers to    349
Owners as the case may require.    350
 Payments in respect of increase of hire arising under this Clause shall be made promptly after    351
receipt by Charterers of all the information necessary to calculate such increase.    352

Salvage 25. Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to    353
or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in    354
successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that    355
Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of    356
services rendered under this Clause 25.    357
 All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers    358
after deducting the master's, officers' and crews' share.    359

Lien 26. Owners shall have a lien upon all cargoes and all freights, sub-freights, sub-hires and demurrage for any    360
amounts
due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not    361
earned, and for all claims for damages arising from any breach by Owners of this charter.    362

Exceptions 27. (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided    363
be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the    364
master, pilots, mariners or other servants of Owners in the navigation or management of the vessel: fire unless    365
caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion,    366
bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however,    367
that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or    368
Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage    369
or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal    370
process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or    371
restraint of princes, rulers or people.    372
 (b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels    373
in distress and to deviate for the purpose of saving life or property.    374
 (c) Clause 27 (a) shall not apply to or affect any liability of Owners or the vessel or any other relevant    375
person in respect of    376
 (i) loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane    377
or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter,    378
whether or not such works or equipment belong to Charterers, or    379
 (ii) any claim (whether brought by Charterers or any person) arising out of any loss of or    380
damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hague    381
Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill    382
of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the    383

Hague-Visby Rules.                                                                                      384

(d)      In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not    385
apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire.     386

**Injurious**
**Cargoes**        28.    No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the    387
foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such    388
damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that    389
would expose the vessel to capture or seizure by rulers or governments.                                390

**Grade of**       29.    Grade agreed mutually by Owners and Charterers, ~~Charterers shall supply marine diesel oil/fuel oil with a~~    391
~~maximum viscosity of~~          ~~Centistrokes at 50~~
**Bunkers**        Grade agreed mutually by Owners and Charterers. ~~degrees Centigrade/ACGFO for main propulsion and diesel oil/~~    392
~~ACGFO for the auxiliaries.~~  If Owners require
the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof.       393
Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality    394
complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading    395
Company and with its specification for marine fuels as amended from time to time. *See rider clause bunker*    396
*quality. Bunkers on delivery are not to be mixed with current bunkers remaining onboard provided that rob of bunkers permit*
*same. Master to be asked and consulted prior bunkering if this can be done, and his advice to be strictly followed.*

**Disbursements**  30.    Should the *Owners master* require advances for ordinary disbursements at any port, Charterers or    397
their agents
shall make such advances to him master, in consideration of which Owners shall pay a commission of two    398
and a half one and a half per
cent, and all such advances and commission shall be deducted from hire.                               399

**Laying-up**      ~~31.      Charterers shall have the option after consultation with Owners of requiring Owners to lay-up the~~    400
~~vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be~~    401
~~adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should~~    402
~~reasonably be made by Owners as a result of such lay-up. Charterers may exercise the said option any number of~~    403
~~times during the charter period.~~                                                                   404

**Requisition**    32.    Should the vessel be requisitioned by any government, de facto or de jure, during the period of this    405
charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in    406
respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of    407
the charter period, *provided Charterers declare such option within 30 days, counting from the last date of agreed off-hire*    408
*period.*

**Outbreak of War**  33.    If war or hostilities break out between any two or more of the following countries: U.S.A., Russia, ,    409
Liberia, Nigeria, Greece, P.R.C. ,U.K., Netherlands-both Owners and Charterers shall have the right to cancel    410
this charter. *reasonably discuss in good faith and mutually agree for the termination or continuation of this*
*charter, provided directly affecting the performance of this charter party.*

**Additional War**  34.    If the vessel is ordered to trade in areas where there is war ( de facto or de jure) or threat of war,    411
**Expenses**       Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which    412
are reasonably incurred by Charterers as a consequences of such orders, ~~provided that Charterers give notice of~~    413
~~such expenses as soon as practicable and in any event before such expenses are incurred and provided further~~    414
~~that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any~~    415
~~claims by Owners under their war risk insurance arising out of compliance with such orders. *Vessel's present insured*~~    416
*value is USD. 11 million.*

**War Risks**      35.    (a)      The master shall not be required or bound to sign bills of lading for any place which in his or    417
Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade,    418
war, hostilities, warlike operations, civil war, civil commotions or revolutions.                     419
(b)      If in the reasonable opinion of the master or Owners it becomes, *for* any of the reasons set out in    420
Clause 35 (a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach    421
or enter, or to load or discharge cargo at any place to which the vessel has been ordered pursuant to this charter    422
( a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages,    423
email and
Charterers thereupon have the right to order the cargo, or such part of it as may be effected, to be loaded or    424
discharged, as the case may be, at any other place within the trading limits of this charter (provided such other    425
place is not itself a place of peril). If any place of peril is or becomes a place of peril and no orders have been    426
received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at    427
liberty to discharge the cargo or such part of its as may be effected at any place which they or the master may in    428
their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due    429
fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.      430
(c)      The vessel shall have liberty to comply with any directions or recommendations as to departure,    431
arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever    432
given by the government of the state under whose flag the vessel sails or any other government or local authority    433
or by any person or body acting or purporting to act as or with the authority of any such government or local    434
authority including any de facto government or local authority or by any person or body acting or purporting to    435
act as or with the authority of any such government or local authority or by any committee or person having under    436
the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by    437
reason of or in compliance with any such directions or recommendations anything is done or is not done, such    438
shall not be deemed a deviation.                                                                       439
If by reason of or in compliance with any such direction or recommendation the vessel does not    440
proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed    441
to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part    442
of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this    443

charter so far as cargo so discharged is concerned. 444

Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of 445
Shipping War Risks Clause 1952. 446

Both to Blame
Collision Clause

36.    If the liability for any collision in which the vessel is involved while performing this charter falls to be 447
determined in accordance with the laws of the United States of America, the following provision shall apply: 448

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any 449
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the 450
management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or 451
liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or 452
damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying 453
ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying 454
ship or her owners as part of their claim against the carrying ship or carrier." 455

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship 456
or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or 457
contact." 458

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the 459
foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be 460
determined in accordance with the laws of the United States of America. 461

New Jason
Clause

37.    General average contributions shall be payable according to the York/Antwerp Rules, ~~1974~~ 1994 *any further* 462
*amendment thereto* and shall

be adjusted in London in accordance with English law and practice but should adjustment be made in accordance 463
with the law and practice of the United States of America the following provision shall apply: 464

"In the event of accident, danger, damage or disaster before or after the commencement of the 465
voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the 466
consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, 467
consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any 468
sacrifices, losses or expenses of general average nature that may be made or incurred and shall pay salvage and 469
special charges incurred in respect of the cargo." 470

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said 471
salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover 472
the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by 473
the cargo, shippers, consignees or owners of the cargo to the carrier before delivery." 474

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the 475
foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and 476
practice of the United States of America. 477

Clause
Paramount

38.    Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the 478
following clause: 479

"(1) Subject to sub-clause (2) hereof, this bills of lading shall be governed by, and have effect subject 480
to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of 481
Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed 482
at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be 483
deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his 484
responsibilities or liabilities under the Hague-Visby Rules." 485

"(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading 486
to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules. 487
Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities 488
or an increase of any of his responsibilities or liabilities under the Hague Rules." 489

"(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules if 490
applicable such term shall be void to that extent but no further." 491

"(4) Nothing in this bills of lading shall be construed as in any way restricting, excluding or waiving the 492
right of any relevant party or person to limit his liability under any available legislation and/or law." 493

TOVALOP

39.    Owners warrant that the vessel is: 494
(i)      a tanker in ~~TOVALOP~~ *ITOPF* and 495
(ii)     properly entered in                                                                                 The Swedish P & I club 496

and will so remain during the currency of this charter. 497

~~When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution~~ 498
~~Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the~~ 499
~~escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or~~ 500
~~not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to~~ 501
~~Owners or master, undertake such measures as are reasonably necessary to prevent or minimize such Pollution~~ 502
~~Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners~~ 503
~~advised of the nature and result of any such measures taken by them and, if time permits, the nature of the~~ 504
~~measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be~~ 505
~~deemed taken on Owners' authority as Owners' agent, and shall be at Owners' expense except to the extent that:~~ 506
~~(1)    any such escape or discharge or Threat was caused or contributed to by Charterers, or~~ 507
~~(2)    by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International~~ 508
~~Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such~~ 509
~~escape or discharge or to the Threat, would have been exempt from liability for the same, or~~ 510
~~(3)    the cost of such measures together with all other liabilities, costs and expenses of Owners arising~~ 511
~~out of or in connection with such escape or discharge or Threat exceeds one hundred and sixty United States~~ 512
~~Dollars (US $160) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States~~ 513
~~Dollars (US $16,800,000), whichever is the lesser, save and insofar as Owners shall be entitled to recover such~~ 514
~~excess under either the 1971 International convention on the Establishment of an International Fund for~~ 515
~~Compensation for Oil Pollution Damage or under CRISTAL.~~ 516

ORIGINAL

~~PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures~~ 517
~~should be discontinued. Owners shall so notify Charterers and thereafter Charterers shall have no right to~~ 518
~~continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this~~ 519
~~Clause 39 shall thereupon cease.~~ 520

~~The above provisions are not in derogation of such other rights as Charterers or Owners may have~~ 521
~~under this charter or may otherwise have or require by law or any International Convention or TOVALOP.~~ 522
~~The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability~~ 523
~~for Oil Pollution dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the~~ 524
~~Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as~~ 525
~~amended from time to time. The terms "Oil", "Pollution Damage" and "Tonnage" shall for the purposes of this~~ 526
~~Clause 39 have the meanings ascribed to them in TOVALOP.~~ 527

*Owners warrant that they are members of the International Tanker Owners Pollution Federation (ITOPF) and that*
*Owners will retain such membership throughout duration of the charter party.*

**Export Restrictions**

40.    The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to 528
which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was 529
produced and/or shipped. 530

Charterers shall procure that all bills of lading issued under this charter shall contain the following 531
clause: 532

" If any laws rules or regulations applied by this government of the country in which the cargo was 533
produced and/or shipped, or any relevant agency thereof impose a prohibition on export of the cargo 534
to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled 535
to require cargo owners forthwith to nominate an alternative discharge place for the discharge of the 536
cargo, or such part of it as may be affected, which alternative place shall not be subject to the 537
prohibition, and carriers shall be entitled to accept orders from orders from cargo owners to proceed to and 538
discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 539
hours after they or their agents have received from carriers notice of such prohibition, carriers shall be 540
at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place 541
on which they or the master may in their or his absolute discretion decide and which is not subject to 542
the prohibition, and such discharge shall constitute due performance of the contract contained in this bill 543
of lading so far as the cargo so discharged is concerned." 544

The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading 545
being deemed to be references to this charter. 546

**Law and Litigation**

41.    (a)    ~~This charter shall be construed and the relations between the parties determined in accordance~~ 547
~~with the laws of England.~~ 548
(b)    ~~Any dispute arising under this charter shall be decided by the English Courts to whose~~ 549
~~jurisdiction the parties hereby agree.~~ 550
(c)    ~~Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain~~ 551
~~the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect~~ 552
~~to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the~~ 553
~~provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being~~ 554
~~in force.~~ 555
(i)    ~~A party shall lose its right to make such an election only if~~ 556
(a)    ~~it receives from the other party a written notice of dispute which~~ 557
(1)    ~~states expressly that a dispute has arisen out of this charter;~~ 558
(2)    ~~specifies the nature of the dispute; and~~ 559
(3)    ~~refers expressly to this clause 41-(c)~~ 560
and 561
(b)    ~~it fails to give notice of election to have the dispute referred to arbitration not later than~~ 562
~~30 days from the date of receipt of such notice of dispute;~~ 563
(ii)    ~~The parties hereby agree that either party may—~~ 564
(a)    ~~appeal to the High Court on any question of law arising out of an award;~~ 565
(b)    ~~apply to the High Court for an order that the arbitrator state the reasons for his award;~~ 566
(c)    ~~give notice to the arbitrator that a reasoned award is required; and~~ 567
(d)    ~~apply to the High Court to determine any question of law arising in the course of the~~ 568
~~reference.~~ 569
(d)    ~~It shall be a condition precedent to the right of any party to a stay of any legal proceedings in~~ 570
~~which maritime property has been, or maybe, arrested in connection with a dispute under this charter, that that~~ 571
~~party furnishes to the other party security to which that other party would have been entitled in such legal~~ 572
~~proceedings in the absence of stay.~~ *General average, if any, to be settled in London as per York / Antwerp Rules 1994* 573
*and any subsequent amendments thereafter to apply. Arbitration, if any, to be settled in London as per English law.*

**Construction**

42.    The side headings have been included in this charter for convenience of reference and shall in no way 574
affect the construction hereof. 575

*The additional clauses 1 upto and including 55, the Appendix A upto 1 and Questionnaire 88 attached are fully*
*incorporated in this Time Charter Party.*

The Owners :                                    The Charterers :

_____          _____

                                                LAURENT CADJI

 NITRAM

ORIGINAL



A.    PERIOD : 4 MONTHS  +/- UPTO 10 DAYS IN CHARTERERS' OPTION.

B.    TANKER AREA TRADING : WEST AFRICA DAKAR - LUANDA RANGE.
      EXCLUDING UN BANNED COUNTRIES AND WARLIKE ZONES AND EXCL. BONY RIVER
      NNOBI ONE / OCRICA TERMINAL
      INTENDED TRADE: LOAD/DISCHARGE SHIP-TO-SHIP OFF SHORE LAGOS AND
      NIGERIAN PORTS.

C.    LAYCAN:  10TH. OF FEBRUARY 2009 - 00:01 - 23:59 HOURS.

D.    CARGOES: 1/2 GRADES CPP UNLEADED UNDARKER THAN 2.5 NPA WITHIN VESSEL'S
      NATURAL SEGREGATION. INTENTION GASOIL, UMS, KEROSINE, JETFUEL.
      TO BE LOADED ALWAYS IN COMPLIANCE WITH VESSEL'S COATING RESISTANCE LIST
      AND VESSEL'S CERTIFICATE OF FITNESS.

E.    DELIVERY : DOP ONE SAFE PORT OR ANCHORAGE COTANOU, FREE OF CARGO AND
      SLOPS.

F.    REDELIVERY: DOP ONE SAFE PORT OR ANCHORAGE COTANOU, FREE PF CARGO AND
      SLOPS.

G.    HIRE : USD 12.500,00 PER DAY PRO RATA, ALL INCL., PAYABLE EVERY 30 DAYS
      IN ADVANCE.

H.    COMMISSIONS:
      2,50 PCT TO NITRAM ON ALL MONIES EARNED, DEDUCTABLE AT SOURCE
      1,25 PCT TO KAIROS ON ALL MONIES EARNED
      1,25 PCT TO ARCHIPELAGO ON ALL MONIES EARNED.

I.    BIMCO BUNKER CLAUSE TO APPLY.

1

ORIGINAL

<u>QUESTIONNAIRE 88 (Version 2)</u>

**INTERTANKO'S STANDARD TANKER VOYAGE CHARTERING QUESTIONNAIRE 1988 (Version 2)**
*(Metric system to be applied, HVPQ reference specified where applicable)*

| GENERAL INFORMATION | 03rd February, 2009 | HVPQ Ref |
|---|---|---|
| Date Updated: | | |
| Vessel's name: | LOVELL SEA | 1.2 |
| IMO number: | 8106070 | 1.3 |
| Vessel's previous name(s): | Sun Light – Jag Puja – Nand Vasu – Crown Confidence – Crown Kapal | 1.4-1.7 |
| Flag: | Liberia | 1.8 |
| Port of Registry: | Monrovia | 1.9 |
| Call sign: | A8JN2 | 1.11 |
| Inmarsat phone number: | +870 764 661 167/8 | 1.12 |
| Fax number: | +870 764 661 169 | 1.13 |
| Email address: | lovellsea@hermes.olesat-maritel.net | 1.16 |
| Type of vessel: | Product Tanker | 1.17 |
| Type of hull: | Double Bottom | 1.19 |

| OWNERSHIP & OPERATION | | |
|---|---|---|
| Registered owner - Full Style: | Lovell Sea Carriers Inc, Marshall Island The Trust Company of the Marshall Islands, Inc. Trust Company Complex Ajeltake Island, Ajeltake Road Majuro, MH96960 Marshall Islands | |
| Technical operator - Full Style: | Archipelago Ships Management SA 70 Filonos Street Piraeus 18535 Greece Tél. +30 2111204900 Fax. +30 2111204990 Email shipops@archipelago.com.gr | 1.22 |
| Commercial operator - Full Style: | Same as above | 1.25 |
| Disponent owner / Bareboat charterer - Full Style: | n/a | |
| Number of vessels in Disponent owner's fleet:: | 6 | |

| BUILDER | | |
|---|---|---|
| Where Built : | Mitsui Eng&Ship Bldg– Chiba Japan | 1.26 |
| Date Delivered: | 02 June 1983 | 1.31 |

| CLASSIFICATION | | |
|---|---|---|
| Vessel's classification society: | Bureau Veritas | 1.34 |
| Class notation: | I+Hull+Mach Oil Tanker Esp | 1.35 |
| If Classification society changed, name of previous society? | Det Norske Veritas | 1.36 |
| If Classification society changed, date of change? | 16 October 2003 | 1.37 |
| Last dry-dock: | 27 September 2006 | 1.38 |
| Last special survey: | 27 September 2006 | 1.41 |
| Latest CAP Rating (if applicable) | CAP 1 | 1.44 |
| Last annual survey: | 26 September 2008 | 1.45 |
| Does the vessel have a statement of compliance issued under the provisions of the Condition Assessment Scheme (CAS)? | Yes | |

| DIMENSIONS | | |
|---|---|---|
| LOA (Length Over All): | 182 Metres | 1.49 |
| Extreme breadth: | 30.031 Metres | 1.51 |
| KTM (Keel to Masthead): | 46 Metres | 1.54 |
| BCM (Bow to Center Manifold): | 92 Metres | 1.57.1 |

ORIGINAL

| | | | | | |
|---|---|---|---|---|---|
| Lightship parallel body length: | | | | 69.10 Metres | 1.57.3 |
| Normal ballast parallel body length: | | | | 83.40 Metres | 1.57.8 |
| Parallel body length at Summer DWT: | | | | 97.60 Metres | 1.57.9 |

| TONNAGES | | |
|---|---|---|
| Net Tonnage: | 10836 | 1.59 |
| Gross Tonnage: | 25692 | 1.60 |
| Suez Net Tonnage: | 22637.53 | 1.61 |
| Panama Net Tonnage: | 21639.99 | 1.62 |

| LOADLINE INFORMATION | Freeboard (Metres) | Draft (Metres) | Deadweight (Tonnes) | Displacement (Tonnes) | |
|---|---|---|---|---|---|
| Summer: | 4.915 | 11.117 | 39701 | 48624 | 1.63 |
| Winter: | 5.146 | 10.886 | 38566 | 47711 | 1.64 |
| Tropical: | 4.684 | 11.348 | 40819 | 49942 | 1.65 |
| Lightship: | 13.602 | 2.43 | | 9123 | 1.66 |
| Normal Ballast Condition: | 9.772 | 6.26 | 17147 | 26270 | 1.67 |

| | | |
|---|---|---|
| TPC on summer draft: | 48.2tonnes | 1.70 |
| Does vessel have Multiple SDWT? | No | 1.72 |
| If yes what is the maximum assigned Deadweight? | N/A | 1.73 |
| Air draft (sea level to top of mast/highest point) in normal SBT condition? | 39.80 Metres | 1.74 |

| RECENT OPERATIONAL HISTORY | | |
|---|---|---|
| Has vessel been involved in any collision, grounding or pollution incident the past 12 months, full description: | No | 1.77-1.78 |

| CERTIFICATION | | |
|---|---|---|
| Owners warrant following certificates to be valid throughout the Charter Party period: | | |
| SOLAS Safety Equipment: | 30 June 2011 | 2.2 |
| SOLAS Safety Radio: | 30 June 2011 | 2.3 |
| SOLAS Safety Construction: | 30 June 2011 | 2.4 |
| Load line: | 30 June 2011 | 2.5 |
| IOPPC: | 01 June 2009 | 2.6 |
| Safety Management (ISM): | 06 Feb 2012 | 2.8 |
| USCG COC: | n/a | 2.11 |
| CLC: | 20 Feb. 2009 | 2.13 |
| US COFR: | 30 June 2009 | 2.15 |
| Certificate of Fitness (Gas/Chemicals): | N/A | 2.16 & 2.17 |
| Certificate of Class: | 30 June 2011 | |
| ISPS ISSC: | 6 Feb 2012 | |

| DOCUMENTATION | | |
|---|---|---|
| Does the vessel have the following documents on board? | | |
| International Safety Guide for Oil Tankers & Terminals (ISGOTT): | Yes ✓ | 2.28 |
| OCIMF/ICS Ship to Ship Transfer Guide (Petroleum): | Yes ✓ | 2.31 |
| Is the vessel entered with ITOPF? | Yes ✓ | |

| CREW MANAGEMENT | | |
|---|---|---|
| Nationality of Master | Filipino | |
| Nationality of Officers: | Filipino | 3.1 |
| Nationality of Crew: | Filipino | 3.2 |
| If Officers/Crew employed by a Manning Agency - Full Style: | Evic Human Resource Mgmnt Inc Ground Floor S&L Building 1500 Roxas Blvd, Ermita Manila Tel 0063 2 404 1064 / 404 0297 Fax 0063 2 404 0298 Or 0063 66 844 7014 | 3.1 & 3.2 |

ORIGINAL

| | E-mail: evic@evic.com.ph | |
|---|---|---|
| What is the common working language onboard? | English | 3.1 |
| Do key officers understand English? | Yes ☑ | |
| In case of Flag Of Convenience (FOC), is the ITF Special Agreement on board? | Yes ☑ | |
| | | |
| **STRUCTURAL CONDITION** | | |
| Are cargo tanks coated? | Yes | 7.1 |
| If Yes, specify type of coating: | Epoxy | 7.1.1 |
| If cargo tanks are coated, specify to what extent: | Whole tanks | 7.1.3 |
| Are slop tanks coated? | Yes | |
| If slop tanks are coated, specify to what extent: | As above | |
| | | |
| **CARGO & BALLAST SYSTEMS** | | |
| If double hull, is vessel fitted with centreline bulkhead in all cargo tanks? | N/A | 8.2 |
| Groups / Tank Capacities 98 % | Center tanks : 1 – 3189.9 cubm 2 – 3234 cubm 3 – 3234 cubm 4 – 3234 cubm 5 – 3234 cubm 6 – 3041.5 cubm  Wings (P & S combined) 1 – 4900.2 cubm 2 – 5866.6 cubm 4 – 5875.2 cubm 5 – 5875.2 cubm 6 – 3910 cubm  Slops tanks 1 – 885.8 cubm 2 – 885.8 cubm | 8.3 |
| Total cubic capacity 98% ex slop tank: | 45694.60 cubm | 8.4 & 8.6 |
| Slop tank(s) capacity 98%: | 1771.60 cubm | 8.5 & 8.7 |
| SBT or CBT? | SBT | |
| If SBT, what percentage of SDWT can vessel maintain with SBT only? | 43% | 8.14.2 |
| If SBT, does vessel meet the requirements of MARPOL Reg 13(2)? | Yes | 8.14.3 |
| Number of natural segregations with double valve: | 4 | 8.15 |
| | | |
| **CARGO PUMPS** | | |
| Type: | Centrifugal | 8.16-8.25 |
| Number: | 4 | 8.16-8.25 |
| Capacity: | 1000 Cu. M/Hour | 8.16-8.25 |
| | | |
| **GAUGING AND SAMPLING** | | |
| Can tank innage/ullage be read from the CCR? | Yes ☑ | 8.46 |
| Can vessel operate under closed conditions in accordance with ISGOTT 7.6.3? | Yes ☑ | 8.51 |
| Type of tank gauging system (radar / floating / other) | Floating | 8.51.1 |
| Are high level alarms fitted and operational in cargo tanks? | Yes | 8.54 |
| | | |
| **VAPOUR EMISSION CONTROL AND VENTING** | | |
| Is a vapor return system fitted? | Yes ☑ | 8.65 |
| State what type of venting system is fitted: | Master riser | 8.67 |
| Max loading rate per midships connection for homogenous cargo? | 1200 Cu. M/Hour | 8.79 |
| | | |
| **CARGO MANIFOLDS** | | |

| | | |
|---|---|---|
| Does vessel comply with the latest edition of the OCIMF 'Recommendations for Oil Tanker Manifolds and Associated Equipment'? | Yes | 8.80 |
| What is the number of cargo connections per side? | Four | 8.83 |
| What is the size of cargo connections? | 304.8 Millimetres | 8.84 |
| What is the material of the manifold? | JIS Steel | 8.86 |
| Distance between cargo manifold centres: | 2000 Millimetres | 8.93 |
| Distance ships rail to manifold: | 3850 Millimetres | 8.95 |
| Distance main deck to centre of manifold: | 1600 Millimetres | 8.97 |
| Height of manifold connections above the waterline at loaded (Summer Deadweight) condition? | 7.48 Metres | 8.101 |
| Height of manifold connections above the waterline in normal ballast? | 12.40 Metres | 8.102 |
| Is vessel fitted with a stern manifold? | Yes | 8.104 |
| Number / size reducers: | 8/ From 408.4 to 304.8 millimeters (diameter)<br>4/ / From 304.8 to 254 millimetres (diameter)<br>4/ From 304.8 to 203.2 millimeters (diameter)<br>4/From 304.8 to 304.8 millimeters (diameter)<br>1/ from 203.2 to 152.4 millimeters (diameter) | 8.106-8.110 |
| | | |
| **CARGO HEATING** | | |
| Type of cargo heating system? | Steam Coils | 8.120 |
| Material of heating system? | Mild Steel | 8.128 |
| Max load temp: | 66 deg Celsius | |
| Max temp maintain: | 57 deg Celsius | |
| | | |
| **IGS & COW** | | |
| Is an Inert Gas System (IGS) fitted? | Yes | 9.1 |
| Is IGS supplied by flue gas, inert gas (IG) generator and/or nitrogen? | Flue gas | 9.3 |
| Is a Crude Oil Washing (COW) installation fitted? | No | 9.17 |
| | | |
| **MOORING ARRANGEMENTS** | | |
| Number / length / diameter / breaking strength of wires: | On Drums | |
| Focsle: | 0 | 10.2 |
| Main deck fwd: | 0 | 10.3 |
| Main deck aft: | 0 | 10.4 |
| Poop: | 0 | 10.5 |
| Number / length / diameter / breaking strength of ropes: | On Drums | |
| Focsle: | 2/200M/64mm/72 Tonnes | 10.11 |
| Main deck fwd: | 1/200M/64mm/72 Tonnes | 10.12 |
| Main deck aft: | 1/200M/64mm/72 Tonnes | 10.13 |
| Poop: | 2/200M/64mm/72 Tonnes | 10.14 |
| | Other Lines | |
| Focsle: | 6/200M/64mm/72 Tonnes | 10.15 |
| Main deck fwd: | 1/200M/64mm/72 Tonnes | 10.16 |
| Main deck aft: | 1/200M/64mm/72 Tonnes | 10.17 |
| Poop: | 6/200M/64mm/72 Tonnes | 10.18 |
| Number and brake holding power of winches: | | |
| Focsle: | 2/45 | 10.22 |
| Main deck fwd: | 1/45 | 10.23 |
| Main deck aft: | 1/45 | 10.24 |
| Poop: | 2/45 | 10.25 |
| How many closed chocks and/or fairleads of enclosed type are fitted on: | | |
| Focsle: | 3 | |
| Main deck fwd: | 4 | |
| Main deck aft: | 4 | |
| Poop: | 4 | |

ORIGINAL

| SINGLE POINT MOORING (SPM) EQUIPMENT | | |
|---|---|---|
| Fairlead size: | 600x450 Millimetres | 10.48 |
| Does vessel comply with the latest edition of OCIMF 'Recommendations for Equipment Employed in the Mooring of Vessels at Single Point Moorings (SPM)'? | Yes ⊔ | 10.60 |
| Is vessel fitted with chain stopper(s)? | Yes ⊔ | 10.61 |
| Number: | 1 | 10.61.1 |
| Type: | Tongue type | 10.61.2 |
| SWL: | 200 Tonnes | 10.61.3 |
| Max diameter chain size: | 76 Millimetres | 10.62 |

| LIFTING EQUIPMENT | | |
|---|---|---|
| Derrick(s) - Number / SWL: | 2 x 10 tones | 10.75 |
| Crane(s) - Number / SWL: | N/A | 10.76 |

| ENGINE ROOM | | |
|---|---|---|
| What type of fuel is used for main propulsion? | IFO 380 CST | 12.5 |
| What type of fuel is used in the generating plant? | M.D.O. | 12.14 |

| MISCELLANOUS | | |
|---|---|---|
| P & I Club name: | The Swedish Club | |
| Last three cargoes (Last / 2nd Last / 3rd Last): | UMS/UMS/UMS | |
| Last three charterers (Last / 2nd Last / 3rd Last): | | |
| Last three voyages (Last / 2nd Last / 3rd Last): | | |
| Date of last SIRE inspection: | n/a | |
| Date of last CDI inspection: | n/a | |
| Current Oil Major Company Acceptances (TBOOK): | n/a | |
| Date and place of last Port State Control: | 27th February, 2008 – Cotonou | |
| Any outstanding deficiencies as reported by any Port State Control? | None | |
| If yes, provide details: | | |

| FOR USA CALLS ONLY | | |
|---|---|---|
| Qualified Individual (QI) - Full Style: | | |
| Oil Spill Response Organization (OSRO) -Full Style: | | |
| Has owner, manager, or operator signed the Sea Carrier Initiative agreement with US customs concerning drug smuggling? | Yes ⊔ | |

Revised: July 2004 (INTERTANKO.com / Q88.com)

  NITRAM                    ORIGINAL



1. AS PER QUESTIONNAIRE 88

2. SUBJECT TO RECONFIRMATION

   NUMBER NATURAL SEGREGATIONS AND TANK GROUPINGS INCLUDING VOLUMES:
   SEE QUESTIONNAIRE 88

3. SPEED/CONSUMPTIONS UPTO AND INCLUDING BFS 4 (IFO 180 CST):
   SPEED LADEN/BALLAST : 12 KNOTS W+SNP

   |               | IFO | MGO |            |
   |---------------|-----|-----|------------|
   | AT SEA LADEN  | 28  | 3.5 |            |
   | BALLAST       | 27  | 3.5 |            |
   | AT PORT IDLE  | 6   | 3.5 |            |
   | DISCHARGE     | 30  | 3.5 | (24 HOURS) |
   | LOADING       | 8   | 3.5 | (24 HOURS) |
   | INERTING      | 10  | 3.5 |            |
   | TANK CLEANING | 12  | 3.5 |            |
   | BALLAST/DEBALLAST | 15 | 3.5 |         |

   VESSEL CAN LOAD ABT. 16.900 MTS AT 6,4 MTRS BRACKISH
               ABT. 23.300 MTS AT 7,8 MTRS BRACKISH

4. LOAD READINESS AT DELIVERY.
   AT PLACE OF DELIVERY IS TO BE IN ALL ASPECTS READY TO LOAD
   CARGO OF 1/2 GRADE(S) CPP AS PER VESSELS COATING RESISTANCE LIST AND
   VESSEL'S DESCRIBED PHYSICAL CHARACTERISTICS. VESSEL WILL BE DELIVERED WITH
   LAST CARGO MOLASSES AND SUITABLE CLEANED ON ARRIVAL TO LOAD UMS AND TO BE
   REDELIVERED WITH LAST 3 CARGOES CLEAN/UNLEADED UNDARKER THAN 2.5 NPA
   PETROLEUM PRODUCTS

   VESSEL TO BE DELIVERED FREE OF SLOPS SUITABLY READY TO LOAD KEROSINE.
   VESSEL TO BE REDELIVERED FREE OF SLOPS WITH LAST CARGO CLEAN AND UNLEADED
   UNDARKER THAN 2.5 NPA. CHARTERERS ARE ALLOWED TO SUPPLY BUNKERS TO THE
   VESSEL PRIOR TO THE DELIVERY DATE.

5. CHARTERERS' OPTION FOR USE OF ALL TANKS SUBJECT TO THE TECHNICAL
   CAPABILITIES OF THE VESSEL HOWEVER OWNERS POINT OUT THAT VESSEL IS UNLIKELY
   TO BE ABLE TO LOAD CARGOES IN ALL TANKS DUE TO STOWAGE/TRIM/STABILITY AND
   STRESSES.

1

NITRAM SHIPBROKING B.V.          Mail address          Tel   +31.181.396566          KVKNR. 24269209
Burg. Van der Jagtkade 10        P.O. Box 170          Fax   +31.181.396669          BTWNR. NL009098631B01
                                 3220 AD Hellevoetsluis E-mail nitram@nitram.nl      IBAN NL63 RABO 0351641769

ORIGINAL



CHARTERERS ARE TO INFORM THE OWNERS 7 DAYS PRIOR TO DELIVERY OF THE VESSEL
OF THE INTENDED CARGO TO BE LIFTED UNDER THIS C/P.
OWNERS ARE TO PREPARE THE RELEVANT NUMBER OF TANKS FOR THIS STOWAGE
ACCORDINGLY.

VESSEL HAS 4 CENTRIFUGAL TYPE PUMPS AND HEAT EXCHANGERS. VESSEL IS TO REMAIN
ON HIRE FOR ANY DELAYS AT DISCHARGE DUE TO THE QUALITY OF THE CPP
INTERFERING WITH VESSEL'S PUMPS AND HEAT EXCHANGERS. CHARTERERS ARE TO HIRE
PORTABLE PUMPS AS REQUIRED.

6.  P. & I. - HULL AND MACHINERY INSURANCE CLAUSE
    OWNERS WARRANT THAT, THROUGHOUT VESSEL'S SERVICE UNDER THIS TIME-
    CHARTER, OWNERS SHALL HAVE FULL VALID PROTECTION AND INDEMNIFY INSURANCE
    (P. & I. INSURANCE) AND VALID EXCESS POLLUTION LIABILITY INSURANCE (EXCESS
    INSURANCE) FOR THE VESSEL, AS DESCRIBED IN SUBPARAGRAPH (7.1) OF THIS
    CLAUSE, WITH THE P. & I INSURANCE PLACED WITH A P&I CLUB WHICH IS A MEMBER
    OF THE INTERNATIONAL GROUP OF P&I CLUBS, THIS P&I INSURANCE AND EXCESS
    INSURANCE ALWAYS TO BE FOR OWNERS' ACCOUNT.

    ALL WAR RISK COSTS INCL. ANY INCREASE OF HULL AND MACHINERY WAR RISK
    PREMIUMS WILL BE FOR CHARTERERS' ACCOUNT. ANY PREMIUMS, OR INCREASES THERETO,
    ATTRIBUTABLE TO CLOSURE (I.E., BLOCKING AND TRAPPING) INSURANCE SHALL
    BE FOR CHARTERERS' ACCOUNT.  SURCHARGES WHICH ARE IN EFFECT ON THE DATE
    OF THIS CHARTER PARTY ARE FOR CHARTERERS' ACCOUNT.

    ANY DISCOUNTS OR REBATES REFUNDED TO OWNERS FOR WHATSOEVER REASON SHALL
    BE PASSED ON TO CHARTERERS .

7.  INSURANCE COVERAGE
    THE P&I INSURANCE MUST INCLUDED COVERAGE AGAINST LIABILITY FOR CARGO LOSS
    AND OR DAMAGE AND COVERAGE AGAINST LIABILITY FOR POLLUTION FOR AN AMOUNT NOT
    LESS THAN US$ 500 MILLION PER INCIDENT.
    THE EXCESS INSURANCE WILL COVER LIABILITY FOR POLLUTION FOR AN AMOUNT NOT
    LESS THAN US$ 200 MILLION PER INCIDENT.

8.  HULL AND MACHINERY INSURANCE
    VESSEL IS INSURED FOR USD 11 MILLION

9.  EVIDENCE
    IF REQUESTED BY CHARTERERS, OWNERS SHALL PROMPTLY FURNISH TO THE
    CHARTER PROPER EVIDENCE OF SUCH P&I INSURANCE, EXCESS INSURANCE AND
    IMMEDIATELY UPON CONFIRMING THIS CHARTER OR AT ANY TIME DURING THE DURATION
    OF THIS CHARTER. THE ABOVE WARRANTY IS TO BE REGARDED AS AN ESSENTIAL PART
    OF THIS CHARTER, WHICH IS CONDITIONAL ON ITS TRUTH OR PERFORMANCE, SO THAT
    ITS BREACH ENTITLES THE CHARTERER, IN CHARTERERS' OPTION, TO TERMINATE THE
    CHARTER AND/OR TO RECOVER ANY DAMAGES ALLOWABLE IN LAW.

2

ORIGINAL



10. HULL MACHINERY VALUE:
     NO CONTRABAND OF WAR SHALL BE SHIPPED. VESSEL SHALL NOT, HOWEVER, BE
     REQUIRED, WITHOUT THE CONSENT OF THE OWNERS, WHICH SHALL NOT BE
     UNREASONABLY WITHHELD, TO ENTER PORT OR ZONE WHICH IS INVOLVED INSTATE OF
     WAR, WARLIKE OPERATIONS OR HOSTILITIES WHETHER THERE BE A DECLARATION OF
     WAR OR NOT, WHERE IT MIGHT BE REASONABLY EXPECTED TO BE SUBJECT TO CAPTURE
     SEIZURE OR ARREST, OR TO A HOSTILE ACT.BY A BELLIGERENT POWER (THE TERM

     "POWER"  MEANING ANY DE JURE OR ODE FACTO AUTHORITY OR ANY OTHER PURPORTED
     GOVERNMENTAL ORGANIZATION MAINTAINING NAVAL, MILITARY OR AIR FORCES.
     FOR THE PURPOSES OF THIS CLAUSE IT SHALL BE UNREASONABLE FOR
     OWNERS TO WITHHELD CONSENT TO ANY VOYAGE ROUTE OR PORT FOR LOADING OR
     DISCHARGE IF INSURANCE AGAINST ALL RISK DEFINED IN ARTICLE 21 (A) IS THEN
     AVAILABLE COMMERCIALLY IN RESPECT OF SUCH VOYAGE, ROUTE OR PORT OF LOADING
     OR DISCHARGE.

     IF SUCH CONSENT IS GIVEN BY THE OWNERS, CHARTERERS WILL PAY THE
     PROVABLE ADDITIONAL COST OF ANY EXTRA COST INCLUDING EXTRA WAR RISK
     INSURANCE, CREW WAR BONUS, BLOCKING AND TRAPPING AND CREW CHANGES TO BE
     FOR CHARTERERS' ACCOUNT.

     HULL AND MACHINERY VALUE USD. 11 MILLION. IN ADDITION, OWNERS MAY
     PURCHASE WAR RISK INSURANCE ON ANCILLERAY RISKS SUCH AS LOSS OF HIRE,
     FREIGHT DISBURSEMENTS, TOTAL LOSS ETC. IF HE CARRIES SUCH INSURANCE FOR
     ORDINARY.MARIME HAZARDS. IF SUCH INSURANCE IS NOT OBTAINABLE COMMERCIALLY
     OR THROUGH GOVERNMENTAL PROGRAM, VESSEL SHALL NOT BE REQUIRED TO ENTER OR
     REMAIN AT ANY SUCH PORT OR ZONE.

     IN THE CASE OF OUTBREAK OF WAR BETWEEN ANY TWO OF THE FOLLOWING
     COUNTRIES:
     GREECE – TURKEY, UNITED STATES OF AMERICA, IRAN, RUSSIA, CIS, PRC, UK,
     GREECE, BAHAMAS AND FOLLOWING SUCH OUTBREAK OF WAR THE FREE TRADE
     OF THE VESSEL IS SIGNIFICANTLY DISRUPTED HEREBY, THEN EITHER OWNERS OR
     CHARTERERS MAY CANCEL THIS CHARTER. IF THE FREE TRADE OF THE VESSEL IS NOT
     SIGNIFICANTLY DISRUPTED, WHICH WOULD IMPLY THAT NEITHER OWNERS OR
     CHARTERERS MAY CANCEL THIS CHARTER.

11.  SHIP-TO-SHIP CLAUSE :
     CHARTERERS SHALL HAVE THE RIGHT TO LOAD AND/OR DISCHARGE BY LIGHTERAGE/SHIP
     TO SHIP TRANSFER.  THE CHARTERERS SHALL PROVIDE A SAFE AND PROTECTED AREA
     OF CONDUCT FOR SUCH LIGHTERAGE OPERATION, WHERE VESSEL CAN SAFELY PROCEED
     TO LIE AND DEPART FROM ALWAYS AFLOAT WHICH SHALL ALWAYS BE SUBJECT TO
     MASTERS APPROVAL WHICH SHALL NOT BE UNREASONABLY WITHHELD.
     UNDER SUCH CIRCUMSTANCES, CHARTERERS SHALL ENSURE THAT ADEQUATE
     FENDERING, HOSES AND NECESSARY EQUIPMENT ARE PROVIDED TO THE SATISFACTION
     OF THE MASTER.
     SUCH OPERATIONS SHALL BE CARRIED OUT IN CONFORMITY WITH THE PROVISIONS OF
     THE LATEST OCIMF SHIP-TO-SHIP TRANSFER GUIDE. BUT IN ANY CASE LIGHTERAGE
     OPERATIONS SHALL BE AT THE REASONABLE DISCRETION OF THE MASTER.

3



IF THE MASTER AT ANY TIME CONSIDERS THAT THE LIGHTERAGE OPERATIONS ARE, OR
LIKELY TO BECOME UNSAFE, THEN HE MAY DISCONTINUE THEM.
WHETHER OR NOT OPERATIONS ARE DISCONTINUED, ALL TIME WILL BE CONSIDERED AS
ON-HIRE.  THE CHARTERERS WILL OBTAIN PERMISSION FROM PROPER AUTHORITIES FOR
PERFORMING LIGHTERAGE.
ALL EXPENSES IN THIS CONNECTION WILL BE FOR CHRTS ACCOUNT. THE FOREGOING IN
NO WAY OVERRIDES THE CHARTERERS OBLIGATION TO PROVIDE A BERTH WHERE THE
VESSEL CAN SAFELY REMAIN AFLOAT.
IN CASE SHIP-TO-SHIP TRANSFER OPERATIONS ARE PERFORMED OUTSIDE PORT
LIMITS AND ADDITIONAL INSURANCE COVER IS REQUIRED SAME TO BE AT CHARTERERS
CHARTERERS EXPENSE.
IN CASE OF SHIP-TO-SHIP LOADING AND/OR DISCHARGING, CHARTERERS TO ENSURE
THAT NOMINATED VESSELS HOLD ALL STATUTORY/FLAG CERTIFICATES, ALWAYS VALID
AND ENDORCED AS THE CASE MAYBE. NOMINATED VESSELS ALWAYS TO FOLLOW
INTERNATIONAL SHIPPING STANDARDS OF SEAWORTHINESS AND SHIP-TO-SHIP SAFETY
GUIDELINES AS PER OCIMF/STS TRANSFER GUIDE. OWNERS ARE ALWAYS ENTITLED TO
REVIEW NOMINATED VESSELS' STATUTORY/FLAG CERTIFICATES FOR ACCEPTANCE PRIOR
TO COMMENCEMENT OF OPERATIONS. ALL VESSELS NOMINATED FOR SHIP-TO-SHIP
OPERATIONS TO BE PROPERLY CLASSED AND COVERED BY FIRST CLASS P&I CLUB.

12.  I.T.F. CLAUSE - DELETED

13.  BOYCOT: OWNERS GUARANTEE THAT THE VESSEL AND HER OWNERS OR MANAGER ARE
NOT ON ANY BLACK OR BOYCOT LIST, HINDERING OR PREVENTING VESSEL'S FREE
TRADING WITHIN THIS CHARTER.
IN THE EVENT OF THE VESSEL BEING SUBJECT TO BOYCOTT, BEING DELAYED OR
RENDERED INOPERATIVE BY STRIKES, LABOR STOPPAGES OR ANY OTHER DIFFICULTIES
ARISING FROM VESSEL'S FLAG, OWNERSHIP, CREW OR TERMS OF EMPLOYMENT OFCREW,
OR OF CHARTERED VESSEL OR ANY OTHER VESSEL UNDER THE SAME OWNERSHIP,
OPERATION OR CONTROL, SUCH TIME LOST IS TO BE CONSIDERED AS OFF-HIRE, FUEL
AND MGO CONSUMED DURING SUCH PERIODS TO BE FOR OWNERS ACCOUNT.

14.  ELIGIBILITY
OWNERS WARRANT THAT THE VESSEL IS IN ALL RESPECTS ELIGIBLE UNDER
APPLICABLE LAWS AND REGULATIONS FOR TRADING TO THE PORTS AND PLACES IN
CLAUSE 4, AND THAT AT ALL NECESSARY TIMES SHE SHALL HAVE ON BOARD ALL
CERTIFICATES, PLANS, MANUALS, RECORDS AND OTHER DOCUMENTS REQUIRED FOR
SUCH SERVICE.
THIS CLAUSE APPLIES TO, BUT IS NOT LIMITED TO, SPECIFIC INTERNATIONAL,
NATIONAL, STATE AND PORT REQUIREMENTS REGARDING POLLUTION, ENVIRONMENT
PROTECTION AND SAFETY WHICH ARE IN EFFECT AT  THE BEGINING OF THE CHARTER
AND WHICH MAY COME INTO EFFECT DURING THE PERIOD OF TE CHARTER.


OWNERS FURTHER WARRANT THAT THE VESSEL DOES, AND WILL, FULLY COMPLY WITH
ALL APPLICABLE CONVENTIONS, LAWS, REGULATIONS AND ORDINANCES OF ANY
INTERNATIONAL, NATIONAL, STATE OR LOCAL GOVERNMENT HAVING JURISDICTION,.
INCLUDING, MARPOL 1973/1978 AND SOLAS 1974/1978/1983, ISM CODE 1998 LOAD
LINE 1966/1971/1973/1979: 72 COLREGS, STCW 1995.

4



OWNERS FURTHER WARRANT THAT THE VESSEL IS, AND WILL REMAIN THROUGHOUT THE
CURRENCY OF THIS CHARTER PARTY, IN ALL RESPECTS IN FULL COMPLIANCE WITH
ALL APPLICABLE LAWS AND REGULATIONS. INCLUDING APPLICABLE INTERNATIONAL,
NATIONAL, SAFE AND LOCAL LAWS AND REGULATIONS, RELATED TO FINANCIAL
RESPONSIBILITY AND SPILL RESPONSE AND ACTIVITIES WITH RESPECT TO OIL/ OR
OTHER POLLUTION, INCLUDING REQUIREMENTS TO HAVE ON BOARD THE VESSEL A
U.S. COAST GUARD CERTIFICATE OF FINANCIAL RESPONSIBILITY (COFR),
CERTIFICATE REQUIRED BY THE INTERNATIONAL CONVENTION ON CIVIL LIABILITY
FOR OIL POLLUTION DAMAGE AND SPIL RESPONSE PLANS.

OWNERS FURTHER WARRANT THAT THE VESSEL IS ENTERED WITH THE INTERNATIONAL
TANKER OWNERS' POLLUTION FEDERATION (ITOPF) AT THE COMMENCEMENT OF THIS
CHARTER AND WILL REMAIN SO DURING THE TERM OF THIS CHARTER PARTY.
IN THE INTEREST OF SAFETY, OWNERS WILL RECOMMEND THAT THE MASTER
OBSERVES THE RECOMMENDATIONS AS TO TRAFFIC SEPARATION AND ROUTING WHICH
ARE ISSUED FROM TIME TO TIME BY THE IMO OR AS PROMULGATED BY THE STATE OF
THE FLAG OF THE VESSEL OR THE STATE IN WHICH THE EFFECTIVE MANAGEMENT OF
THE VESSEL IS EXERCISED.

ANY DELAYS, LOSSES, EXPENSES OR DAMAGES ARISING AS A RESULT OF
FAILURE TO COMPLY WITH THIS CLAUSE SHALL BE FOR OWNERS' ACCOUNT
CHARTERERS SHALL NOT BE LIABLE TO PAY HIRE DURING TIMES OF
INSPECTIONS BY REGULATOR AUTHORITIES NOT HIRE OF DELAY CAUSED BY
VESSEL'S FAILURE TO COMPLY WITH FOREGOING WARRANTIES.

15. CREW
OWNERS WARRANT THAT THE NATIONALITY OF THE OFFICERS AND CREW OF THE VESSEL
DOES NOT PROHIBIT THE VESSEL FROM CALLING AT ANY PORT OR PLACE, TO WHICH
CHARTERERS HAVE THE RIGHT TO ORDER THE VESSEL UNDER THE TERMS OF THIS
CHARTER. ANY TIME LOST AND EXPENSES INCURRED BECAUSE OF THE VESSEL' FAILURE
TO COMPLY WITH THE ABOVE SHALL BE FOR OWNERS' ACCOUNT. OWNERS WARRANT THAT
SENIOR OFFICERS ARE WITH GOOD KNOWHOW OF THE ENGLISH LANGUAGE, SUFFICIENT
TO A GOOD AND SAFE OPERATION FOR THIS VESSEL.

16. HEATING.
VESSEL FITTED WITH HEAT EXCHANGERS AND IS CAPABLE OF MAINTAINING 85 DEGC'.
HEATING SHALL BE CARRIED OUT IN  ACCORDANCE WITH CHARTERERS' / CARGO
SUPPLIERS WRITTEN INSTRUCTION AND DULY LOGGED IN VESSEL'S DECK LOG BOOK.
CHARTERERS RESERVE THE RIGHT TO HOLD THE VESSEL OUT OF BERTH OR REMOVE FROM
ANY BERTH AT ANY TIME AT OWNERS' TIME AND EXPENSE UNTILL THE VESSEL IS IN
COMPLIANCE WITH CARGO HEATING INSTRUCTIONS.

17. SWEEPING.- DELETED

18. EXXON DRUG AND ALCOHOL POLICY CLAUSE.
OWNERS WARRANT THAT THEY HAVE A POLICY ON DRUGS AND ALCOHOL ABUSE POLICY)
APPLICABLE TO THE  VESSEL WHICH MEET OR EXCEEDS THE STANDARDS IN THE OIL
COMPANIES INTERNATIONAL MARINE FORUM GUIDELINES FOR THE CONTROL OF DRUGS
AND ALCOHOL ON BOARD THE SHIP.

5

ORIGINAL



UNDER THE POLICY ALCOHOL IMPAIRMENT SHALL BE
DEFINED AS A BLOOD ALCOHOL CONTEST OF 40 MG/100 ML OR GREATER.
THE APPROPRIATE SEAFARERS TO BE TESTED SHALL BE ALL THE VESSEL'S OFFICERS
AND THE DRUG/ALCOHOL TESTING AND ADDITION TO ROUTINE MEDICAL EXAMINATIONS.

THE POLICY SHOULD BE THAT THE FREQUENCY OF THE UNANNOUNCED TESTING TO BE
ADEQUATE TO ACT AS AN EFFECTIVE ABUSE DETERRENT AND THAT ALL OFFICERS BE
TESTED ONCE A YEAR THROUGH A COMBINED PROGRAM OF UNANNOUNCED TESTING AND
ROUTINE MEDICAL EXAMINATION. OWNERS FURTHER WARRANT THAT THE POLICY WILL
REMAIN IN EFFECT DURING THE TERM OF THIS CHARTER AND THAT OWNERS SHALL
EXERCISE DUE DILIGENCE TO ENSURE THAT THE POLICY IS COMPLIED WITH. IT IS
UNDERSTOOD THAT AN ACTUAL IMPAIRMENT OR ANY TEST FINDING OF IMPAIRMENT
SHALL NOT IN AND OR ITSELF MEAN OWNERS HAVE FAILED TO EXERCISE DUE
DILIGENCE.

19. EMERGENCY RESPONSE PLAN.
    OWNERS TO HAVE, IN EFFECT, AN UPDATED WRITTEN APPROVED RESPONSE PLAN AND
    FURNISH CHARTERERS WITH A COPY OF THE PLAN WITHIN 10 DAYS OF DELIVERY AND
    SUBSEQUENT COPIES OF ITS REVISIONS AS APPROPRIATE. THE EMERGENCY RESPONSE
    PLAN MUST INCLUDE IDENTIFICATION OF PROPRIETARY OR THIRD PARTY CONTRACTS
    THAT WILL RESPOND TO ANY EMERGENCY INCIDENT WHICH MAY OCCUR WITHIN THE
    TRAFFIC ROUTES COVERED BY THIS CHARTER.

20. CLAIMS
    ANY CLAIM(S) OF WHATSOEVER NATURE WHETHER MADE BY OWNERS AGAINST CHARTERERS
    OR CHARTERERS AGAINST OWNERS, SHALL BE MADE WITHIN 12 MONTHS REDELIVERY.
    SHOULD ANY CLAIM(S) NOT BE RENDERED AS HEREIN STATED, IT SHALL BE DEEMED TO
    HAVE BEEN WAIVED AND NEITHER SIDE SHALL MAKE AN APPLICATION FOR AN
    EXTENTION OF TIME UNDER SECTION 27 OF THE ARBITRATION ACT OF 1950.

21. CHARTERERS' EQUIPMENT.
    CHARTERERS HAVE OWNERS' PERMISSION TO SUPPLEMENT LINES AND MOORING WIRES,
    LOAD AND/OR DISCHARGE PIPES/EQUIPMENT, IF REQUIRED, AT NO ADDITIONAL COSTS
    TO OWNERS.
    CHARTERERS HAVE THE OPTION TO REMOVE AT THEIR EXPENSE SUCH
    MATERIAL/EQUIPMENT PRIOR OR UPON REDELIVERY.

22. CARGO GRADES
    CHARTERERS HAVE THE RIGHT TO LOAD UP TO THREE GRADES WITH DOUBLE VALVE
    SEGREGATION WITHIN VESSEL'S NATURAL SEGREGATION. MAIN GRADES CAN BE LOADED
    WITH FULL LINE/PUMP/DOUBLE VALVE SEGREGATION.
    CHARTERERS HAVE THE RIGHT TO INCREASE NUMBER OF GRADES WITHIN A SEGREGATION
    BY SHARING SAME LINES/PUMPS AT CHARTERERERS' OWN RISK AND CHARTERERS TO
    INDEMNIFY OWNERS OF ANY LOSS/DAMAGE AND CONSEQUENCES ARISING THEREFROM.

23. HULL AND MACHINERY VALUE 11 MILLION.

6



24. NOTICE AND DELIVERY
    WHERE APPLICABLE: OWNER TO PROVIDE 15/10/5/3/2/1 DAY(S) NOTICE OF
    DELIVERY TO CHARTERER SPECIFYING BEST ESTIMATE OF DELIVERY DATE, AND
    PLACE IF APPLICABLE, AND FUEL/MGO ESTIMATED TO BE ON BOARD ON
    DELIVERY. REDELIVERY NOTICES: CHARTERERS TO GIVE 10/7/5 DAYS APPROX THEN
    CHARTERERS WILL ENDEAVOUR TO GIVE 3/2/1 DAYS FIRM NOTICES OF REDELIVERY
    NATURE OF THE TRADE COULD CAUSE 1-2 DAYS DELAY)

25. SURVEY AND SAMPLE CLAUSE
    A. CHARTERERS' INDEPENDENT INSPECTOR MAY SURVEY AND TAKE SAMPLES FROM ALL
       BUNKER TANKS AND OTHER VESSEL SPACES AT THE TIME OF VESSEL'S LOADING AND
       DISCHARGING WITH TIME LOST, IF ANY, TO COUNT AS HIRE.

    B. CHARTERERS' REPRESENTATIVE MAY BOARD THE VESSEL AT ANY PORT OF CALL TO
       OBSERVE CARGO HANDLING OPERATIONS, TO INSPECT LOGS AND CERTIFICATES AND
       TO CONFIRM THAT OWNERS ARE FULFILLING THEIR OBLIGATIONS UNDER THIS
       CHARTER, SUBJECT TO MASTER'S APPROVAL WHICH NOT TO BE UNREASONABLY
       WITHHELD AND SIGNING USUAL INDEMNITIES.

26. CARGO TRANSFER CLAUSE
    AT NO TIME DURING THE VOYAGE SHALL CARGO BE TRANSFERRED BETWEEN
    VESSEL'S TANKS WITHOUT THE EXPRESS CONSENT OF CHARTERERS. SUCH
    CONSENT SHALL BE REQUESTED BY MEANS OF TELEX OR CABLE SPECIFYING LOADED
    AND REVISED ULLAGES AND CARGO QUANTITIES FOR THE TANKS CONCERNED AND
    REASONS NECESSITATING A CARGO TRANSFER. CONSENT OF EXPEDITIOUSLY BY TELEX
    OR CABLE MASTER TO CONFIRM TO CHARTERERS THAT OPERATION HAS BEEN CARRIED
    OUT. IN THE EVENT TRANSFER OF CARGO IS UNAVOIDABLE FOR EMERGENCY
    REASONS INVOLVING RISK TO VESSEL'S STRUCTURAL INTEGRITY OR SAFETY OR LIFT
    OR FOR SAFE NAVIGATION, THE PRIOR CONSENT OF CHARTERERS SHALL NOT BE
    REQUIRED. HOWEVER, THE MASTER SHALL INFORM CHARTERERS OF ANY SUCH
    CIRSUMSTANCES AS SOON AS POSSIBLE THEREAFTER BY TELEX OR CABLE.

27. ISM CODE
    FROM THE DATE OF COMING INTO FORCE OF THE INTERNATIONAL SAFETY MANAGEMENT
    (ISM) CODE IN RELATION TO THE VESSEL AND THEREAFTER DURING THE CURRENCY
    OF THIS CHARTER, THE OWNERS SHALL PROCURE THAT BOTH THE VESSEL AND "THE
    COMPANY" (AS DEFINED BY THE ISM CODE) SHALL COMPLY WITH THE REQUIREMENT
    OF THE ISM CODE.
    UPON REQUEST THE OWNERS SHALL PROVIDE A COPY OF THE RELEVANT DOCUMENT OF
    COMPLIANCE (DOC) AND SAFETY MANAGEMENT CERTIFICATE (SMC) TO THE
    CHARTERERS.
    EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS, DAMAGE, EXPENSE
    ON DELAY CAUSED BY THE FAILURE ON THE PART OF THE OWNERS OR "THE COMPANY"
    TO COMPLY WITH THE ISM CODE SHALL BE FOR THE OWNERS' ACCOUNT.

28. CANAL / SEAWAY FITTINGS
    VESSEL IS FULLY FITTED TO TRANSIT SUEZ CANAL/PANAMA CANAL AND SHALL
    REMAIN SO FOR THE DURATION OF THIS CHARTER PARTY. (STILL AWAITING OWNERS
    CONFIRMATION ON PANAMA CANAL)

7

ORIGINAL



29.   PRIVATE AND CONFIDENTIAL
      THIS CHARTER AND ALL NEGOTIATIONS PERTAINING THERETO SHALL BE KEPT
      STRICTLY PRIVATE AND CONFIDENTIAL BY ALL PARTIES CONCERNED.

30.   VESSEL IS EQUIPPED WITH MIN (REVERTING) MOVEABLE BUTTERWORTH MACHINES.
      VESSEL IS CAPABLE OF OPERATING (REVERTING) MACHINES SIMULTANEOUSLY/
      PER MACHINE AT         DEGREES C.

31.   OFF - HIRE PERIODS
      DURING ANY OFF-HIRE PERIOD EXCEEDING EIGHT 8 DAYS, THE OWNERS TO GIVE
      THE CHARTERERS NOT LESS THAN FIVE(5) DAYS DEFINITE NOTICE OF RESUMPSTION
      OF THE SERVICE.
      IF THE VESSEL HAS BEEN OFF-HIRE FOR AN AGGREGATE PERIOD OF MORE THAN (2)
      TWO MONTHS DAYS DURING THE CHARTER PERIOD THE CHARTERERS HAVE, IN THEIR
      OPTION, THE RIGHT TO CANCEL THE CHARTER WITHOUT FURTHER NOTICE TO OWNERS.

32.   ON AND OFF HIRE SURVEYS TO BE SHARED 50/50. ONHIRE SURVEY TO BE CONDUCTED
      ON DELIVERY / OFFHIRE TO BE CONDUCTED ON REDELIVERY.

33.   HOSE CONNECTIONS
      IF REQUESTED, OWNERS AGREE THAT CONNECTION AND DISCONNECTION
      OF CARGO HOSES AT LOADING AND DISCHARGING PORTS WILL BE DONE BY
      VESSEL'S CREW IF IT IS A CUSTOM OF THE PORT AND LOCAL AUTHORITIES PERMIT.

34.   CARGOES
      ALL CPP CARGOES LOADED UNDER THIS CHARTER PARTY TO BE IN ACCORDANCE WITH
      THE COATING MANUFACTURES RESISTANCE LIST OF THE VESSEL, HARMLESS TO
      COATING, LINES AND PUMPS AND ALWAYS IN COMPLIANCE WITH CERTIFICATE OF
      FITTNESS FOR THE CARRIAGE OF DANGEROUS SUBSTANCES IN BULK AND ALWAYS IN
      COMPLIANCE WITH N.L.S. CERTIFICATE FOR THE CARRIAGE OF DANGEROUS
      SUBSTANCES IN BUILT. LAST THREE CARGOES: SOYA + SUNFLOWER OILS / UREA /
      TROPICAL OILS.

35.   LOAD/DISCHARGING FROM BARGES.IN ACCORDANCE WITH OCIMF REGULATIONS
      CHARTERERS HAVE THE OPTION TO LOAD AND DISCHARGE FROM/TO BARGES
      AND/OR BUNKERING SERVICES AT SEA AND IN PORT WHEN PERMITTED BY THE PORT
      AUTHORITIES ACORDING TO USUAL PRACTICE, BUT ONLY UNDER CONDITIONS WHEN NO
      RISK TO VESSEL OCCUR ACCORDING TO MASTER'S REASONABLE JUDGMENT.

36.   CURRENT ITINERARY: TBA

37.   TRADING: WEST AFRICA DAKAR-LUANDA RANGE, EXCLUDING UN BANNED COUNTRIES AND
      WARLIKE ZONES AND EXCLUDING BONY RIVER NNOBI ONE/OCRICA TERMINAL. INTENDED
      TRADE: LOAD/DISCHARGE SHIP-TO-SHIP OFF SHORE LAGOS AND NIGERIAN PORTS.

8

ORIGINAL



VESSEL TO ALWAYS TRADE TO/VIA/FROM ICE FREE PORTS AND APPROACHES.
VESSEL NOT TO FORCE ICE OR FOLLOW ICEBREAKER/S.

CHARTERERS SHALL NOT USE VESSEL FOR LIGHTERING ON AN EXCLUSIVE BASIS.

38.  BIMCO BUNKER FUEL SULPHUR CONTENT CLS   (MARPOL)

39.  BIMCO ISM CLAUSE

40.  BIMCO ISPS CLAUSE FOR TIME CHARTER PARTIES TO APPLY.

41.  MASTER TO SEND NOON REPORT EVERYDAY STATING USUAL ITEMS INCL. POSITION +
     CARGO ROB + BUNKERS ROB + BUNKERS CONSUMED LAST 24  HOURS.

42.  ALL TAXES, DUES AND/OR CHARGES PAYABLE ON VESSEL/CARGO, FREIGHT/SUB-
     FREIGHT, SUB-CHARTER HIRE ARISING OUT OF CARGOES CARRIED OR PORTS
     VISITED UNDER THIS CHARTER TO BE ON CHARTERER'S ACCOUNT.
     SAID ITEMS WILL BE FOR OWNERS' ACCOUNT WHEN SUCH ITEMS ARE CONSUMED,
     EMPLOYED OR INCURRED FOR OWNERS' PURPOSES OR WHILE THE VESSEL IS
     OFF-HIRE.

43.  GENERAL AVERAGE IF ANY TO BE SETTLED IN LONDON AS PER YORK ANTWERP
     RULES 1994 AND ANY SUBSEQUENT AMENDMENTS THEREAFTER TO APPLY.

44.  ARBITRATION, IF ANY, TO BE SETTLED IN LONDON AS PER ENGLISH LAW.

45.  NEW JASON CLAUSE, NEW BOTH TO BLAME COLLISION CLAUSE

44.  ANY CERTIFICATE/APPROVAL/CLEARANCE/WAIVER/PERMISSION/FEES ETC. AS
     MAY BE REQUIRED BY ANY NIGERIAN AUTHORITY TO ENTER INTO A PORT A/O
     SAIL FROM A PORT A/O CARRY OUT CARGO OPERATIONS (INCLUDING BUT NOT
     LIMITED TO NMA, NPA, CUSTOMS, NAVY, DPR, NAVAL CLEARANCE, TASK FORCE
     PERMISSION) TO BE ARRANGE BY CHARTERERS AT THEIR TIME AND EXPENSE.
     SHOULD ANY DELAYS BE INCURRED SAME TO BE FOR CHARTERERS' ACCOUNT.

45.  ANY DELAY IN NIGERIAN/WAFR IN BERTHING, LOADING, DISCHARGING OR
     SAILING DUE TO STRIKES, BAD WEATHER, LOCKOUTS, RESTRAINTS,
     WORK-TO-RULE, GO SLOW AND OF OTHER CAUSE OVER WHICH OWNERS/MASTER/
     CREW HAVE NO CONTROL TO COUNT AS ON HIRE TIME AND EXPENSES SO
     INCURRED TO BE FOR CHARTERERS ACCOUNT.

46.  BUNKERS:
     VESSEL TO BE DELIVERED WITH ABT 296.915 MTS IFO AND 21.7 MTS MGO AND TO BE
     REDELIVERED WITH SIMILAR QUANTITIES (EXACT FIGURES TO BE DETERMINED BY ON-
     AND OFF HIRE BUNKER SURVEY) BUNKERS TO BE KEPT FULLY SEGRAGATED SINCE
     CHARTERERS WILL PLACE THEIR OWN BUNKERS ON BOARD FAILING WHICH, AND IN CASE
     OF EMERGENCY, VESSEL WILL UTILISE ITS STOCK OF IFO AND MGO OBQ AND
     CHARTERERS SHALL PAY AT COST AGAINST OWNERS' INVOICE AND LAST BUNKER
     INVOICE.

9

ORIGINAL



PAYMENT TO BE DONE TOGETHER WITH NEXT HIRE PAYMENT. IF PAYMENT IS NOT
RECEIVED ON TIME, OPERATIONS WILL BE SUSPENDED UNTILL PAYMENT IS EFFECTED.

CHARTERERS WILL SUPPLY THE VESSEL WITH BUNKERS AS PER GIVEN SPECIFICATIONS,
OWNERS CONFIRM THESE BUNKERS CAN BE USED AS IFO AND MGO DURING THE TIME
CHARTER. HOWEVER OWNERS CANNOT GUARANTEE C/P SPEED OF 12 KN DUE TO THE LOWER
SPECIFIC CALORIFIC VALUE OF MDO THAT WILL BE USED FOR BOTH IFO AND MGO
BUNKERS.

BUNKER TANKS: CHARTERERS SHALL HAVE AT LEAST 475 MT SPACE IN AT THEIR
DISPOSAL.

47. COMINGLING/BLENDING CLAUSE:
   (A)    CHARTERERS TO HAVE THE OPTION TO PERFORM COMINGLING, BLENDING
OPERATION(S) ON BOARD VESSEL DURING LOADING, UPON COMPLETION OF LOADING
OR AT INTERMEDIATE PORT(S) OR EN ROUTE TO DISCHARGE PORT(S).
COMINGLING/BLENDING OF GRADES SHALL ALWAYS BE SUBJECT TO MASTER'S LOADING
PLAN AND APPROVAL WHICH NOT TO BE UNREASONABLY WITHHELD.
IF NEW SETS OF BILLS OF LADING ARE REQUIRED TO BE ISSUED BY CHARTERER,
THEN CHARTERER TO ENSURE THAT ALL ORIGINAL COPIES OF OLD BILLS OF LADING ARE
GIVEN TO OWNER (OR OWNER'S REPRESENTATIVE OR AGENT) OR TO MASTER BEFOREHAND.
   (B)       NEITHER MASTER NOR THE OWNER TO BE HELD RESPONSIBLE FOR ANY
DAMAGE OR CONTAMINATION AFFECTING THE QUALITY OF THE END PRODUCTS AS A
RESULT OF MASTER FOLLOWING CHARTERER'S INSTRUCTION REGARDING HANDLING OF
CARGO.
CHARTERERS SHALL PROVIDE OWNERS WITH LETTER OF INDEMNITY FOR BLENDING
OPERATION AS PER OWNER'S P&I CLUB WORDING.

48. EPIDEMICS CLAUSE:
   THE VESSEL NOT TO BE ORDERED TO NOR BOUND TO ENTER ANY PLACE WHERE FEVER OR
EPIDEMICS ARE PREVALENT OR TO WHICH THE MASTER, OFFICERS AND CREW BY LAW ARE
NOT BOUND TO FOLLOW THE VESSEL.

49. BP WAR RISK INSURANCE CLAUSE (AMENDED):
   OWNERS SHALL EFFECT WAR RISKS INSURANCE IN RESPECT OF THE HULL AND MACHINERY
OF THE VESSEL AND THEIR OTHER INTERESTS (INCL BUT NOT LIMITED TO, LOSS OF
EARNINGS AND DETENTION AND THEIR PROTECTION AND INDEMNITY RISKS), AND THE
BASIC PREMIUMS AND/OR CALLS THEREFORE SHALL BE FOR OWNERS' ACCOUNT.
WAR RISKS INSURANCE ADDITIONAL PREMIUMS DIRECTLY INCURRED AS A RESULT OF THE
VESSEL ENTERING AN EXCLUDED AREA SHALL BE FOR CHARTERERS' ACCOUNT, NET OF
ALL DISCOUNTS OR REBATES RECEIVED BY OWNERS, AND PROVIDED ALWAYS THAT
CHARTERERS ARE GIVEN AN INDICATION OF THE EXPECTED AMOUNT OF ADDITIONAL
PREMIUM AS SOON AS POSSIBLE.

ORIGINAL



THE BENEFIT OF DISCOUNTS OR REBATES ON ADDITIONAL PREMIUM RECEIVED BY OWNERS FROM THEIR WAR RISKS INSURERS, UNDERWRITERS OR BROKERS SHALL BE CREDITED TO CHARTERERS IN FULL.
CHARTERERS SHALL REIMBURSE OWNERS ANY AMOUNTS DUE UNDER THIS CLAUSE UPON RECEIPT OF OWNERS' INVOICE TOGETHER WITH REASONABLE SUPPORTING DOCUMENTATION INCLUDING ALL ASSOCIATED DEBIT AND CREDIT NOTES (IF ANY). FOR THE AVOIDANCE OF DOUBT ANY SPECIFIC 'BLOCKING AND TRAPPING','LOSS OF PROFIT', 'LOSS OF HIRE', 'LOSS OF FREIGHT' OR 'LOSS OF BUNKERS' INSURANCE TAKEN OUT BY OWNERS IN RESPECT OF THE VESSEL, AND ANY ADDITIONAL PREMIUM RELATING THERETO ARISING FROM CHARTERERS' TRADING OF THE VESSEL SHALL BE FOR OWNERS' ACCOUNT.
VESSEL'S H&M VALUE : USD 11 MILLION

50. CANCELLATION CLAUSE:
    IF VESSEL IS UNABLE TO MEET AGREED LAYCAN OWNERS TO ADVISE CHARTERERS OF HER ETA AND CHARTERERS HAVE THE OPTION TO CANCEL THE CHARTER PARTY WITHOUT RECOURSE TO EITHER PARTY PROVIDED SAME ADVISED WITHIN 24 HRS OF OWNERS NOTICE FAILING WHICH C/P TO REMAIN IN FULL FORCE AND EFFECT WITH NEW LAYCAN BEING 48 HOURS AFTER ETA.

51. CLEANING OF TANKS:
    IF TIME PERMITS AND PROVIDED LOCAL REGULATIONS PERMIT, CLEANING OF VESSEL'S TANKS, PUMPS AND LINES TO BE PERFORMED BY VESSEL'S CREW WHICH TO BE ABLE TO PERFORM SUCH DUTIES IN ACCORDANCE WITH STANDARD TANK CLEANING PROCEDURE. IN ANY CASE, CLEANING TO BE DONE AT CHARTERERS' TIME AND EXPENSE AND IN ACCORDANCE WITH THEIR INSTRUCTIONS AND ANY ADDITIONAL CLEANING MATERIALS ARE TO BE PROVIDED FOR BY CHARTERERS. TREATMENT/DISPOSAL OF SLOPS AFTER ANY CLEANING OPERATION DURING THE CURRENCY OF THIS TIME CHARTER, TO BE ON CHRTRS TIME AND EXPENCE.

52. WAFR CLAUSES FOR TIME CHARTER:
    FIRST HIRE TO BE PAID W/I 2 BANKING DAYS UPON VESSEL TENDERING NOR, FAILING WHICH OWNERS TO HAVE THE RIGHT TO WITHDRAW VESSEL FROM CHARTERERS SERVICE WITHOUT NOTICE. SUBSEQUENT HIRE PAYMENTS TO BE MADE W/I 2 BANKING DAYS UPON INVOICED, FAILING WHICH OWNERS TO HAVE THE RIGHT TO SUSPEND OPERATIONS OR VESSEL'S MOVEMENTS. IF CHARTERERS DELAY PAYMENT FOR MORE THAN 3 BANKING DAYS, OWNERS TO HAVE THE RIGHT TO MOVE VESSEL TO A PORT OR PLACE OF REFUGE, WITHIN TRADING RANGE (AT CHARTERERS TIME AND EXPENSE) AND AWAIT THERE UNTIL PAYMENT IS EFFECTED. AS THIS IS CONSIDERED A MATERIAL BREACH OF CHARTER PARTY TERMS, CHARTERERS ARE NOT ENTITLED TO PROVIDE VESSEL/OWNERS WITH FURTHER VOYAGE INSTRUCTIONS BUT ONLY, AND AFTER RELEVANT PAYMENTS ARE EFFECTED, TO PROVIDE OFFTAKING VESSELS TO RECEIVE THEIR CARGO, AT THE PLACE OR PORT OF REFUGE. OWNERS ELECTION TO ACT OR NOT TO ACT AS AFORESAID IS WITHOUT PREJUDICE TO ANY OTHER RIGHTS OR CLAIMS OWNERS MIGHT HAVE AS A RESULT TO CHARTERERS FAILURE TO EFFECT PAYMENTS IN TIME.

11

ORIGINAL



53. B/L ~ CARGO RELEASE CLAUSE :
MASTERS/OWNERS TO RELEASE CARGO AGAINST CHARTERES LETTER OF INDEMNITY AS PER
OWNERS' PANDI CLUB WORDING, BUT SAME WITHOUT BANGUARANTEE.

WHENEVER L.O.I. REQUESTED CHARTERERS TO ISSUE SAME AS PER OWNERS' PANDI CLUB
WORDING ON CHARTERERS LETTERHEAD, STAMPED AND SIGNED BY AUTHORIZED STAFF
ONLY.

54. COMMISSIONS :
    2,50 PCT TO NITRAM ON ALL MONIES EARNED, DEDUCTABLE AT SOURCE
    1,25 PCT TO KAIROS ON ALL MONIES EARNED
    1,25 PCT TO ARCHIPELAGO ON ALL MONIES EARNED.

55. QUESTIONNAIRE 88 AS ATTACHED.

THE OWNERS:                         THE CHARTERERS :

_____                _____

12

EXHIBIT B





Archipelago Ships Management S.A.                                          15/07/2009

## LOVELL SEA - FINAL STATEMENT OF ACCOUNTS

| Description | Date | | | | |
|---|---|---|---|---|---|
| 1ST HIRE INVOICE | 10/2/2009 0:01 | 30.00 | $12,500.00 | | |
| COMMISSION | 12/3/2009 0:01 | | | | |
| | 2.50% | | | | |
| 2ND HIRE INVOICE | 12/3/2009 0:01 | 30.00 | $12,500.00 | | |
| COMMISSION | 11/4/2009 0:01 | | | | |
| | 2.50% | | | | |
| IFO CONS. | 6.3 | 514.00 | | $3,238.20 | $3,238.20 |
| MGO CONS. | 3.8 | 950.00 | | $3,610.00 | $3,610.00 |
| AWRP | 11/2/2009-12/02/090 | | | $1,500.00 | $1,500.00 |
| AWRP | 14/02/09-03/03/06 | | | $2,622.84 | $2,622.84 |
| SUPERNUMERARIES | 12/2/2009 | 3.00 | $15.00 | $135.00 | $135.00 |
| | 15/2/2009 | | | | |
| SUPERNUMERARIES 2 | 15/2/2009 | 4.00 | $15.00 | $120.00 | $120.00 |
| | 19/2/2009 | | | | |
| SUPERNUMERARIES 3 | 18/2/2009 | 18.00 | $15.00 | $270.00 | $270.00 |
| | 9/3/2009 | | | | |
| 3RD HIRE INVOICE | 11/4/2009 0:01 | 30.00 | $12,500.00 | | |
| COMMISSION | 11/5/2009 0:01 | | | | |
| | 2.50% | | | | |
| OFF HIRE 1 | 15/3/2009 10:08 | 0.61944 | $12,500.00 | | |
| COMMISSION | 16/3/2009 1:00 | | | | |
| | 2.50% | | | | |
| OFF HIRE 2 | 2/4/2009 12:36 | | | | |
| | 2/4/2009 18:45 | 0.25625 | $12,500.00 | | |
| COMMISSION | 2.50% | | | | |
| AWRP | 8/3/2009 | | | $3,702.84 | $3,702.84 |
| | 1/4/2009 | | | | |
| AWRP CORRECTION FOR OFF HIRE 1 | | | | $455.10 | $455.10 |
| SUPERNUMERARIES | 12/3/2009 | 30.00 | $15.00 | $450.00 | $450.00 |
| | 11/4/2009 | | | | |
| 4TH HIRE INVOICE | 11/5/2009 0:01 | 30.00 | $12,500.00 | | |
| COMMISSION | 10/6/2009 0:01 | | | | |
| | 2.50% | | | | |
| CREDIT NOTE FOR OVER PAYMENT | 31/5/2009 0:01 | 10.00 | $12,500.00 | | |
| | 10/6/2009 0:01 | | | | |
| | 2.50% | | | | |
| AWRP | 7/4/2009 | | | $4,320.00 | $4,320.00 |
| | 4/5/2009 | | | | |
| SUPERNUMERARIES | 11/4/2009 | 30.00 | $15.00 | $450.00 | $450.00 |
| | 11/5/2009 | | | | |
| 5TH HIRE INVOICE | 1/6/2009 0:01 | 30.00 | $8,750.00 | | |
| COMMISSION | 1/7/2009 0:01 | | | | |
| | 2.50% | | | | |
| AWRP | 5/5/2009 | | | $3,085.69 | $3,085.69 |
| | 25/5/2009 | | | | |
| SUPERNUMERARIES | 11/5/2009 | 30.00 | $15.00 | $450.00 | $450.00 |
| | 10/6/2009 | | | | |
| REDELIVERY DIFFERENCE | 20/6/2009 20:54 | 10.12986 | $8,750.00 | | $88,636.28 |
| COMMISSION | 1/7/2009 0:01 | | | | |
| | 2.50% | | | $2,215.91 | |
| IFO ROB | 20/6/2009 20:54 | 9.599 | | | |
| IFO SUPPLIED | 20/6/2009 | 116.70 | | | |
| IFO AS PER ADDENDUM NO 1 | 23/3/2009 | 123.34 | | | |
| BALANCE | | -2.954 | $514.00 | | $1,518.36 |
| AWRP | 25/5/2009 | | | $3,797.12 | |
| | 20/6/2009 | | | | |
| SUPERNUMERARIES | | 10.00 | $15.00 | $150.00 | |
| MDO ROB | 20/6/2009 20:54 | 47.83 | $535.00 | | $25,589.05 |
| | | | | $1,928,028.88 | $2,038,595.54 |

DUE TO OWNERS

EXHIBIT C

# FAX TRANSMISSION



51 Eastcheap
London EC3M 1JP
United Kingdom
Telephone: +44 (0) 20 7623 1244
Facsimile: +44 (0) 20 7623 5427
DX: 1071 London/City
www.clydeco.com

ABU DHABI  BANGALORE*  BELGRADE*  CARACAS  DOHA  DUBAI  GUILDFORD  HONG KONG  LONDON  MOSCOW  MUMBAI*  NANTES  NEW YORK
PARIS  PIRAEUS  RIO DE JANEIRO  RIYADH*  SAN FRANCISCO  SHANGHAI  SINGAPORE  ST PETERSBURG*  Clyde & Co LLP offices and associated * offices

| | |
|---|---|
| **TO** | Lovell Sea Carries Inc<br>c/o Archipelago Ships Management SA |
| **FAX NO** | +30 211 1204990 |
| **ATTN** | John Meravidis |
| **YOUR REF** | |
| **DATE** | 15 September 2009 |

**OUR REF**    MBK/0908679

**TOTAL PAGES (including cover)**    3

Dear Sirs

**MT "Lovell Sea" (the "Vessel")**
**Charterparty dated 5 February 2009 (the "Charterparty")**

We are the London Solicitors of Union Glory Limited.

As you know, our client is the Charterer of the Vessel under the Charterparty. We are instructed in connection with the outstanding debt of US$109,580.66 due and owing to our client, this being the final balance as per the Final Statement of Accounts presented following redelivery of the Vessel.

Clearly, there can be no dispute that the said amount of US$109,580.66 (the "Debt") is due and owing to our client. The position in this regard is confirmed in the said Final Statement of Accounts (a copy of which is attached herewith for ease of reference) which was prepared for and on behalf of Owners.

Our client has chased payment of the Debt on a number of occasions without success and its patience is now at an end. Accordingly, unless the Debt is paid in full within 7 days, we are instructed to commence arbitration proceedings against you and take all appropriate additional action to secure our client's claim without further notice.

Any payment should be made and as per the attached remittance instructions.

Yours faithfully

Clyde & Co LLP

---

**IF YOU HAVE NOT RECEIVED THE TOTAL NUMBER OF PAGES OR NEED ASSISTANCE, PLEASE CALL +44 (0) 20 7623 1244**
**CONFIDENTIALITY NOTICE**

This facsimile and/or the documents accompanying it may be privileged and confidential and exempt from disclosure under applicable law.
If the reader is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient,
any unauthorised use, disclosure, copying, distribution or dissemination is strictly prohibited. If you have received our facsimile (or any copy) in error,
please immediately notify us by telephone on +44 (0) 20 7623 1244 and return this facsimile and any copies to us as soon as possible. Thank you.
Clyde & Co LLP is a limited liability partnership registered in England and Wales under number OC326539. A list of members is available for inspection at
its registered office 51 Eastcheap, London EC3M 1JP. Clyde & Co LLP uses the word "partner" to refer to a member of the LLP, or an employee or
consultant with equivalent standing and qualifications. Regulated by the Solicitors Regulation Authority.



## INSTRUCTIONS FOR REMITTANCE OF FUNDS

Funds may be transferred to your account by SWIFT.

The message should be authenticated between the sending bank and HSBC Republic Bank (UK) Limited, Hill Street, London.

> **SWIFT Address:**   HSBC Private Bank (UK) Limited, 78 St James's Street, London, SW1A 1JB
> **SWIFT Code:**   **SMCO GB2P**

---

### INFORMATION TO BE INCLUDED ON SWIFT PAYMENT INSTRUCTIONS:

1. Account name          Union Glory Ltd

2. Account Number        **505578** (For Multi Currency Payments)

3. Sort Code             40-04-42
                         HSBC Private Bank (UK) Limited
                         78 St James's Street, London, SW1A 1JB
                         **Swift Code: SMCO GB2P**

Attention                Ashley Brown

4. Amount of funds       XXXXXXXXXX

Optional – you may also include the remitter's name and/or identifying details such as an invoice number.

---

For payments in USD

Please request that the sending Bank place the payment cover with the following bank:

**Favoured Bank for payment:   HSBC Bank USA, New York**
                **Swift ID:**   **MRMDUS33**
       **Account Number:**   **000-04330-3**
               **Favour:**   **SMCO GB2P**

For payments in EUR

Please request that the sending Bank place the payment cover with the following bank:

**Favoured Bank for payment:   HSBC Bank plc, London**
                **Swift ID:**   **MIDLGB22**
       **Account Number:**   **37690892**
               **Favour:**   **SMCO GB2P**

---



Archipelago Ships Management S.A.                                                                15/09/2009

## LOVELL SEA - FINAL STATEMENT OF ACCOUNTS

| | | | | | |
|---|---|---|---|---|---|
| 1ST HIRE INVOICE | 10/2/2009 0:01 | 30.00 | $12,500.00 | | |
| | 12/3/2009 0:01 | | | | |
| COMMISSION | 2.50% | | | | |
| 2ND HIRE INVOICE | 12/3/2009 0:01 | 30.00 | $12,500.00 | | |
| | 11/4/2009 0:01 | | | | |
| COMMISSION | 2.50% | | | | |
| IFO CONS. | 6.3 | $514.00 | | $3,238.20 | $3,238.20 |
| MGO CONS. | 3.8 | $950.00 | | $3,610.00 | $3,610.00 |
| AWRP | 11/2/2009-12/02/090 | | | $1,500.00 | $1,500.00 |
| AWRP | 14/02/09-03/03/09 | | | $2,622.84 | $2,622.84 |
| SUPERNUMERARIES | 12/2/2009 | 3.00 | $15.00 | $135.00 | $135.00 |
| | 15/2/2009 | | | | |
| SUPERNUMERARIES 2 | 15/2/2009 | 4.00 | $15.00 | $120.00 | $120.00 |
| | 19/2/2009 | | | | |
| SUPERNUMERARIES 3 | 19/2/2009 | 18.00 | $15.00 | $270.00 | $270.00 |
| | 9/3/2009 | | | | |
| 3RD HIRE INVOICE | 11/4/2009 0:01 | 30.00 | $12,500.00 | | |
| | 11/5/2008 0:01 | | | | |
| COMMISSION | 2.50% | | | | |
| OFF HIRE 1 | 15/3/2009 10:08 | 0.6194 | $12,500.00 | | |
| | 16/3/2009 1:00 | | | | |
| COMMISSION | 2.50% | | | | |
| OFF HIRE 2 | 2/4/2009 12:36 | 0.75625 | $12,500.00 | | |
| | 7/4/2009 18:25 | | | | |
| COMMISSION | 2.50% | | | | |
| AWRP | 2/3/2009 | | | $3,702.84 | $3,702.84 |
| | 1/4/2009 | | | | |
| AWRP CORRECTION FOR OFF HIRE 1 | | | | $455.10 | $455.10 |
| SUPERNUMERARIES | 12/3/2009 | 30.00 | $15.00 | $450.00 | $450.00 |
| | 11/4/2009 | | | | |
| 4TH HIRE INVOICE | 11/5/2009 0:01 | 30.00 | $12,500.00 | | |
| | 10/6/2009 0:01 | | | | |
| COMMISSION | 2.50% | | | | |
| CREDIT NOTE FOR OVER PAYMENT | 31/5/2009 0:01 | 10.00 | $12,500.00 | | |
| | 10/6/2009 0:01 | | | | |
| | 2.50% | | | | |
| AWRP | 7/4/2009 | | | $4,320.00 | $4,320.00 |
| | 4/5/2009 | | | | |
| SUPERNUMERARIES | 11/4/2009 | 30.00 | $15.00 | $450.00 | $450.00 |
| | 11/5/2009 | | | | |
| 5TH HIRE INVOICE | 1/6/2009 0:01 | 30.00 | $8,750.00 | | |
| | 1/7/2009 0:01 | | | | |
| COMMISSION | 2.50% | | | | |
| AWRP | 5/6/2009 | | | $3,085.69 | $3,085.69 |
| | 25/5/2009 | | | | |
| SUPERNUMERARIES | 11/5/2009 | 30.00 | $15.00 | $450.00 | $450.00 |
| | 10/6/2009 | | | | |
| REDELIVERY DIFFERENCE | 20/6/2009 20:54 | 10.12986 | $8,750.00 | | $88,636.28 |
| | 1/7/2009 0:01 | | | | |
| COMMISSION | 2.50% | | | $2,215.91 | |
| IFO ROB | 10/6/2009 20:54 | 9.509 | | | |
| IFO SUPPLIED | 20/6/2009 | 116.70 | | | |
| IFO AS PER ADDENDUM NO 1 | 23/3/2009 | 129.24 | | | |
| BALANCE | | -2.954 | $514.00 | | $1,518.36 |
| AWRP | 25/5/2009 | | | $3,797.12 | |
| | 20/6/2009 | | | | |
| SUPERNUMERARIES | | 10.00 | $15.00 | $150.00 | |
| MGO ROB | 20/6/2009 20:54 | 47.23 | $535.00 | | $25,589.05 |
| | | | | $1,926,018.18 | $2,031,509.54 |

DUE TO OWNERS